**William F. HIRK, Plaintiff-Appellant,**

v.

**AGRI–RESEARCH COUNCIL, INC., John Burlington, and Glenn Andersen, Defendants-Appellees.**

**No. 76–2011.**

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1977.

Decided Sept. 6, 1977.

---

James L. Fox, Chicago, Ill., Richard E. Nathan, Commodity Futures Trad. Comm., Washington, D. C., for plaintiff-appellant.

Jacob N. Gross, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, PELL and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff, William F. Hirk, is appealing the dismissal of his amended complaint alleging violations of the Federal Securities Act of 1933 and the Commodity Exchange Act for failure to state a claim.[1] Count I of the amended complaint charged a violation of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e) and Count II charged a violation of Section 4b of the Commodity Exchange Act of 1936 (7 U.S.C. § 6b).[2] According to the plaintiff, the two individual defendants, brokers and dealers in securities, fraudulently induced him to enter into a trading agreement with defendant Agri-Research Council, Inc. (ARCO), a company engaged in managing discretionary futures trading accounts. Pursuant to this agreement, Hirk opened an account with Miller-Lane & Co., an ARCO futures commission merchant, placed $10,000 in the account, and executed a power of attorney appointing defendant Burlington as his agent and attorney-in-fact to trade in his account. Under this designation, Burlington made numerous transactions in Hirk's account, using Hirk's funds as margin deposits. Burlington is the vice-president of the corporate defendant ARCO; defendant Andersen is its president.

Hirk claims that during the course of Burlington's solicitation of the trading agreement, defendants concertedly made various misrepresentations to him regarding the profitability of their enterprise, the competency and experience of the professional analysts on their staff, and the information that would be sent to him regarding trading recommendations and futures trends. They also told Hirk that he would be provided with information concerning all the transactions in his account. Additionally, they made representations that Hirk would lose no more than $7,500 and that at no time would his account fall below $2,500. Notwithstanding that they knew he was inexperienced in commodity trading, they failed to advise him that this was a high risk venture in which substantial losses could occur. Moreover, they showed him profit and loss statements of other accounts which generally gave him the impression that all accounts managed by them were profitable.

---

1. Hirk's amended complaint contained three pendent claims based on violations of the Illinois Blue Sky Law, common law misrepresentations, and a breach of fiduciary duty. These claims were originally dismissed with the federal claims on June 28, 1976. The order of dismissal was subsequently modified to read "without prejudice" to the pendent claims. Since these separate claims are not involved in the appeal, we state no opinion as to their merit.

2. Because the district court dismissed the amended complaint for failure to state a claim, the well-pleaded allegations therein must be taken as true. *Cruz v. Beto,* 405 U.S. 319, 321–322, 92 S.Ct. 1079, 31 L.Ed.2d 263.

Hirk claims he eventually lost his initial $10,000 investment and an additional $17,880 he was required to pay to cover losses in his account. In both federal counts, he sought $27,880 in actual damages and $100,000 in exemplary and punitive damages.

## I. *Applicability of Federal Securities Acts*

In Count I of his original complaint, Hirk alleged that the discretionary futures trading agreement and the power of attorney which he executed constitute either "an investment contract" or "[a] certificate of interest or participation in [a] profit-sharing agreement," thus qualifying as a security under the Securities Act of 1933 (15 U.S.C. § 77b(1)) and the Securities Act of 1934 (15 U.S.C. § 78c(a)(10)). As securities, defendants were obligated to register them pursuant to Section 5 of the 1933 Act (15 U.S.C. § 77e) and to comply with the anti-fraud provisions of both those Acts (15 U.S.C. §§ 77q, 78j(b), 78*o* (c) and SEC Rules 10b–5, 15c1–2 and 15c1–7). He claims that their failure to do so makes them liable for his loss of over $28,000 under 15 U.S.C. § 77 *l.*

Count I was dismissed on June 24, 1974, on the ground that the arrangement entered into by Hirk was not an "investment contract" and therefore not a "security" under 15 U.S.C. § 77b(1) and § 78c(a)(10) because the requisite element of "common enterprise" was lacking. Applying the *Milnarik* [3] test for determining an investment contract, the court found that Hirk's allegations of overlapping investment services and the similarity of concomitant transactions in various discretionary trading accounts by the defendants did not transform Hirk's single account, limited to his own investment, into a joint account with other investments. Mem. op. 3–5. Attempting to eliminate this flaw in his pleadings, Hirk filed an amended complaint alleging that the defendants treated all of the discretionary trading accounts in substantially the same manner and consequently that he shared pro-rata with the other accounts "as if" all the funds had been commingled. He further alleged that his investment monies were employed by the defendants to finance ARCO's operating expenses and the advertising scheme used to attract other investors. The district court dismissed this amended Count I on August 30, 1974, finding that the similar treatment afforded Hirk and other investors was insufficient to establish the requisite commonality, "especially in light of plaintiff's claim that such treatment was in direct contravention of defendants' representations and plaintiff's expectations" (mem. op. 3–5).

### A. *No Investment Contract*

On appeal, Hirk challenges the district court's holding that this discretionary trading account is not an investment contract and hence that the anti-fraud provisions of the Federal Securities Acts are not applicable. He realizes that because of the virtual identity of the definitions of security contained in the two federal securities laws, any determination that the arrangement qualifies as a security under one statute will control the disposition of that issue with respect to the companion law. *Tcherepnin v. Knight,* 389 U.S. 332, 335–336, 88 S.Ct. 548, 19 L.Ed.2d 564. He is also aware that unless this Court overrules its prior decision in *Milnarik v. M-S Commodities, Inc.,* 457 F.2d 274 (7th Cir. 1972), certiorari denied, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144, holding that a discretionary trading account is not a security, or that the alleged facts in this case are distinguishable from those in *Milnarik,* his attempts to reverse the district court's decision on Count I must fail. For the following reasons, this Court affirms this portion of the district court's decision.

The *Milnarik* court was guided in the construction of the term "security" by several important principles: first, the pur-

---

**3.** *Milnarik v. M-S Commodities, Inc.,* 457 F.2d 274 (7th Cir. 1972), certiorari denied, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144. For a discussion of this case, see part I.A., *No Investment Contract, infra,* of this opinion.

pose of the federal security laws is remedial in nature; second, the legislature has directed that these laws be construed liberally and flexibly to effectuate their purpose (*Tcherepnin, supra,* 389 U.S. at 336, 88 S.Ct. 548, 553); and third, "form should be disregarded for substance and the emphasis should be on economic reality" (*id.*). Within this tripartite framework, *Milnarik* applied the well-recognized definition of an investment contract established in *SEC v. W. J. Howey,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244, "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others," and found that the element of commonality was lacking. Judge Stevens (now Justice Stevens) reached this conclusion because the investors in *Milnarik* did not expect to obtain profits from the operation of all the discretionary trading accounts managed by their common broker, but rather from their individual trading accounts independently of all others. Indeed, he concluded that all that was created by the discretionary arrangement was an agency-for-hire relationship. 457 F.2d at 276–278. Accord, *Wasnowic v. Chicago Board of Trade,* 352 F.Supp. 1066, 1069 (M.D.Pa.1972), affirmed without opinion, 491 F.2d 752 (3rd Cir. 1974), certiorari denied, 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 2407; *Stuckey v. duPont Glore Forgan, Inc.,* 59 F.R.D. 129, 131 (N.D.Cal.1973); contra, *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974); *Marshall v. Lamson Bros. & Co.,* 368 F.Supp. 486, 487 (S.D.Iowa 1974); *Berman v. Orimex Trading, Inc.,* 291 F.Supp. 701, 702 (S.D.N.Y.1968); *Maheu v. Reynolds & Co.,* 282 F.Supp. 423 (S.D.N.Y.1968).

Hirk argues that the *Milnarik* definition of "common enterprise" as requiring both multiple investors and a pooling of their funds erodes the remedial potential of the securities acts and accordingly should be reexamined. He recommends that this Circuit adopt the contrary position of the Fifth Circuit in *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974). This we decline to do for the following reasons:

In *Continental Commodities,* the Fifth Circuit restated its endorsement of the Ninth Circuit's formulation of a common enterprise as "one in which the fortunes of the investor are interwoven with and dependent upon the effort and success of those seeking the investment or of third parties." 497 F.2d at 522 (quoting *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 n.7 (9th Cir. 1973), certiorari denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53). Although this formulation superficially appears co-terminous with the *Milnarik* definition of common enterprise as "joint participants in the same investment enterprise" (457 F.2d at 277), the Fifth Circuit's interpretation differs from this Circuit's. In the Fifth Circuit's analysis, the critical factor is whether or not "the fortunes of all investors are inextricably tied" to the success of the trading enterprise. 497 F.2d at 522 (quoting *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 479 (5th Cir. 1974)). By stating so, it acknowledged that it was expressly rejecting the necessity of a pooling of investments or investor remuneration on a pro-rata sharing of profits, citing the following cases to substantiate its position: *Blackwell v. Bentsen,* 203 F.2d 690, 691–692 (5th Cir. 1953), certiorari dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078; *SEC v. Glenn W. Turner Enterprises, Inc., supra,* 474 F.2d 476, 482; *Marshall v. Lamson Bros. & Co.,* 368 F.Supp. 486, 489 (S.D.Iowa 1974); *Maheu v. Reynolds & Co.,* 282 F.Supp. 423, 429 (S.D.N.Y.1968). See also *Loss, Securities Regulation* 489 (2d ed. 1961).

Because *Milnarik* was decided prior to *Continental Commodities* and did not directly address the pooling issue,[4] this Court must determine whether the *Milnarik* conclusion subsumes the existence of a pooling of funds or a pro-rata distribution of prof-

---

4. In *Milnarik* no allegations were made that a common enterprise existed comprised of all people possessing discretionary trading accounts. No claim was made that the accounts were traded in a uniform manner. Nor were there any allegations of a pooling of funds. 457 F.2d at 278.

its.[5] Aside from the general tenor of the case, a reading of footnote 7 indicates that Judge Stevens interpreted *Howey* as requiring just such a pooling. He noted that the Supreme Court had stated there that the individual investor had no right to specific fruit. "The Company is accountable only for an allocation of the net profits based upon a check made at the time of picking. All the produce is *pooled* by the responding companies which do business under their own names" (emphasis added). 457 F.2d at 279 n. 7 quoting 328 U.S. at 296, 66 S.Ct. at 1102. Later, in another passage from *Howey*, which Judge Stevens felt was indicative of its estimation of the relative importance of separate as opposed to common elements of the enterprise, he stated "The investors provide the capital and *share in the earnings and profits;* the promoters manage, control and operate the enterprise" (*id.* quoting 328 U.S. at 300, 66 S.Ct. at 1104 (emphasis added)).

■ It is apparent then that this Court's decision in *Milnarik* was based on the assumption that a sharing or pooling of funds is required by *Howey,* and we are unwilling to overrule that determination. The appellate cases cited in *Continental Commodities* for the contrary proposition tend to support this Circuit's analysis. Thus in *Blackwell v. Bentsen, supra,* the facts were essentially the same as those in *Howey.* The investors purchased a deed for a tract of land which was part of a citrus grove managed by the defendant corporation. As in *Howey,* the deed served as a convenient method of determining the investors' allocable shares of the profits. In *Glenn W. Turner, supra,* the court was concerned with *Howey*'s meaning

of "solely" in the context of "solely from the efforts of others." Although the Ninth Circuit never addressed the issue of pooling of funds there, it did note that the investors would profit if, and only if, the company prospered. Profit paid to the investor was based on how well he sold the company's self-improvement courses to others and was directly proportional to the amount of money the new customer invested in the company. Under such an arrangement a pooling of funds must have occurred. Since these cases offer little or no substantiation for the Fifth Circuit's position, this Court's position in *Milnarik* will remain the controlling precedent in this Circuit.[6]

■ Aware of the overwhelming impact of *Milnarik* on the facts of this case, Hirk attempted to circumvent it in the district court by alleging in his amended complaint that his monies and those of other investors were treated as if commingled (par. 9(c)). It is obvious that the amended complaint is insufficient on its face to satisfy the pooling requirements. "As if commingled" is not the same as commingled. Furthermore, each discretionary trading account is unitary in nature; each account has a success or failure rate without regard to the others. Hirk's effort to sidestep this fact by stressing in paragraph 6 that substantially similar transactions were made in all accounts and that profits or losses ebbed or flowed uniformly also fails because the necessary pooling remains unshown.

■ Hirk suggests that if we are unwilling to adopt the Fifth Circuit's position on the pooling of funds requirement, we instead re-examine *Milnarik* in terms of the

---

5. See *Stevens v. Woodstock, Inc.,* 372 F.Supp. 654 (N.D.Ill.1974) in which Judge Tone, then a district judge, suggested that even where commingling of funds occurs, a common enterprise is not formed because the investors have not authorized any pooling. Lacking a common purpose, there could be no common enterprise. *Id.* at 657. Judge Decker adopted this rationale in his dismissal order.

6. In *Lamson Bros., supra,* the court was presented with substantially the same facts as this Court is here. Giving great deference to administrative interpretations by the Securities

and Exchange Commission, which Judge Stuart interpreted as not requiring pooling, and stressing the remedial nature of the Acts, the court found that the *Howey* definition of a common enterprise was broad enough to encompass a discretionary trading account. The *Maheu* court, *supra,* decided before *Milnarik,* simply stated that a discretionary trading account which was managed and supervised in all respects by a brokerage firm was an investment contract under the *Howey* test. No facts or analyses were offered which explain the court's decision, and *Milnarik* disapproved of it.

remedial purpose of the Acts, the legislative directives of flexibility, and the emphasis on substance over form. *Tcherepnin, supra,* 389 U.S. at 332, 336, 88 S.Ct. 548. This we decline to do for the reason that the *Milnarik* court reached its decision within this framework and quoted with approval the following portion of the district court's decision:

"Although this Court recognizes that the registration requirements of Section 5 are for the protection of the public and that any exemption therefrom must be strictly construed against one claiming it, * * *the unitary nature of the contract here involved is not overcome even when the transaction is viewed most strongly against the defendants.*" 457 F.2d at 277. (Citations omitted; emphasis added.)

In conclusion, we reiterate the position taken in *Milnarik* that "[W]e do not believe every conceivable arrangement that would fit a dictionary definition of an investment contract was intended to be included within the statutory definition of a security." *Id.* at 275–276.

B. *No Certificate of Interest or Participation in a Profit-Sharing Agreement*

The contract creating the arrangement between Hirk and ARCO contained a clause which required that 25% of the profits accrued during a one-month period in Hirk's account would be paid to ARCO as compensation for its advisory services. Hirk maintains that this arrangement constitutes a certificate of interest or participation in a profit-sharing agreement, and therefore a security under 15 U.S.C. § 77b(1) and § 78c(a)(10). He argues that with its 75%–25% profit-sharing clause, the contract must be deemed to fall within the literal definition in the Acts, as well as what Professor Lewis Loss has termed "[t]he classic example of [such an agreement] is a contract whereby the buyer furnishes the funds and the seller the skill for speculating in the stock or commodity markets under an arrangement to split any profits." *Loss, Securities Regulation* 489 (2d ed. 1961).

In order to be covered by the federal securities laws, a certificate of interest or participation in a profit-sharing agreement must contain the same element of commonality as required by *Milnarik* for an investment contract. The cases cited by Professor Loss demonstrate that courts have made no real distinction between investment contracts and profit-sharing plans. Furthermore, in all these cases wide-spread public participation in profits was a common characteristic of the securities involved. See, *e. g., SEC v. Latta,* 250 F.Supp. 170 (N.D.Cal.), affirmed *per curiam,* 356 F.2d 103 (9th Cir. 1965), certiorari denied, 384 U.S. 940, 86 S.Ct. 1459, 16 L.Ed.2d 539 (contracts to assign undivided distributive shares in a decedent's estate in event of recovery); *SEC v. Bill Willoughby Coin Exchange.* Fed.Sec.L.Rep. (CCH) ¶ 91,355 (1961–1964 Decisions) (coin investment program where funds of investors are pooled and used in purchase and sale of coins); *SEC v. Addison,* 194 F.Supp. 709 (N.D.Tex.1961) (loan notes entitling the lenders to interests in mining and other operations); *SEC v. Tung Corp.,* 32 F.Supp. 371 (N.D.Ill.1940) (contracts selling forested lands with lease back agreement requiring seller to care for trees at fixed annual charges).

Hirk argues, however, that *SEC v. Wickham,* 12 F.Supp. 245 (D.Minn.1935), a case cited by the district court on this point, is, contrariwise, supportive of his position.[7] In that case, the court found a discretionary trading account with a 60%–40% profit split to be a security. What Hirk fails to note and what this Court deems to be the essential difference between that case and the instant case is that in *Wickham* the funds obtained from the various investors were all deposited and commingled in one or more bank accounts. *Id.* at 248.

Because the element of commonality is also absent here, the profit-sharing agree-

---

**7.** The Supreme Court's citation to *Wickham* in *Howey,* 328 U.S. at 299 n. 5, 66 S.Ct. at 1103, is solely to indicate that the *Wickham* court used the proper definition of an investment contract in rendering its decision.

ment between the parties cannot be deemed a security within the meaning of the security laws.

## II. *Applicability of Commodity Exchange Act*

On June 24, 1974, the district court dismissed Count II of Hirk's original complaint alleging a violation of Section 4b of the Commodity Exchange Act of 1936 (7 U.S.C. § 6b) on the ground that the complaint did not state a cause of action because the statements and omissions did not occur "in connection with any order to make, or the making of any contract of sale of any commodity for future delivery." Mem. op. 9.[8] Thereafter Hirk filed an amended complaint setting forth additional facts supporting the allegations of fraud. On June 28, 1976, the district court entered a minute order dismissing Count II of the amended complaint on the basis of its June 24, 1974, memorandum opinion.

Hirk and the Commodity Futures Trading Commission, appearing here as *amicus curiae,* suggest that the decision of the district court represents a formalistic and ultra-restrictive construction of Section 4b which has no reasonable basis in the language of the Act, its legislative history or in decisions that have interpreted analogous anti-fraud provisions of other remedial legislation. As such, the lower court's decision is clearly at variance with the Supreme Court's repeated admonition that federal statutes enacted to prevent fraud should be construed flexibly to effectuate their remedial purposes.

Section 4b of the Commodity Exchange Act (7 U.S.C. § 6b) provides in pertinent part:

"It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, *in or in connection with* any order to make, or the making of, any contract of sale of any commodity in in-

terstate commerce, made, or to be made * * * for or on behalf of any other person, or (2) for any person, *in or in connection with* any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made * * * for or on behalf of any other person * * *

(A) to cheat or defraud or attempt to cheat or defraud such other person;
(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; * * * *."

(Emphasis added.)

The district court interpreted the underscored "in connection with" language of the statute as addressing only conduct related to persuading a customer to purchase a commodities futures contract or in reporting to a customer the status of the contract or the trading. Because the deceptive conduct asserted here involved solicitation "in connection with" a contract for discretionary trading accounts and occurred prior to actual trading in the account, the court concluded that it was not included within the scope of Section 4b. Mem. op. 8–9. We disagree.

The language of Section 4b prohibits any person from engaging in fraudulent or deceptive practices "in or in connection with" futures transactions and proscribes as well the mere attempt to defraud or to deceive "in or in connection with" those activities. By its terms, Section 4b is not restricted in its application to instances of fraud or deceit "in" orders to make or the making of

---

8. Private damage actions are allowable under the Commodity Exchange Act. See, *e. g., Deaktor v. L. D. Schreiber & Co.,* 479 F.2d 529, 534 (and cases cited therein) (7th Cir. 1973), rev'd on other grounds *sub nom. Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344.

contracts. Rather, Section 4(b) encompasses conduct "in or in connection with" futures transactions. The plain meaning of such broad language cannot be ignored.

Furthermore, any doubts as to whether or not this language was meant to cover the deceptive conduct herein alleged are resolved by the enactment of Section 205(a) of the Commodity Futures Trading Commission Act of 1974. This new provision, addressing the use of mail in interstate commerce by commodity trading advisors,[9] makes it unlawful:

"(A) to employ any device, scheme, or artifice to defraud any client or participant or *prospective client or participant;* or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or *prospective client or participant.*" 7 U.S.C.A.Supp. § 6*o* (1)(A)(B). (Emphasis added.)

Also, the legislative history relating to the grant of enforcement powers to the new Commodity Exchange Commission in 1974 indicates Congress' awareness of this pretrading conduct and that it was, in part, the impetus for granting the Commission its strong enforcement powers. Testimony in the House indicated the

"existence of schemes of systematic *solicitations* and *bilking of unsophisticated potential customers* attracted to certain non-regulated futures contracts investments by *misleading advertising*" (emphasis added). H.R.Rep. No. 93–975, 93d Cong., 2d Sess. 48–49 (1974).

Moreover, the legislative history of the 1936 Act indicates that its purpose was to protect investors and was designed, among other things, to eliminate "[c]ertain trade practices involving the cheating of customers

* * *." S.Rep. No. 1431, 74th Cong., 1st Sess. 3 (1935). Clearly Congress has recognized through the years that fraudulent and deceptive conduct in connection with futures transactions can and does occur prior to the actual opening of a trading account and has intended to regulate it by including the "in connection with" language in Section 4b.

Our construction of this language is reinforced by the Supreme Court's similar interpretation of identical language used in the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b) and SEC Rule 10b–5 (17 C.F.R. 240.10b–5). For example, the Supreme Court repeated recently that the language in Section 10(b) must be read "flexibly, not technically and restrictively" (*Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128), although the deceptive practices merely "touch" the sale of securities (*id.* at 12–13, 92 S.Ct. 165).[10]

There is no justification in the language of Section 4b or the legislative history of the Act to accept the district court's narrow interpretation of the broad "in connection with" phrase. Accordingly, we hold that Count II does state a cause of action.

Affirmed as to the federal securities laws; reversed and remanded as to Commodity Exchange Act; costs to be borne by the respective parties.

---

**9.** Commodity trading advisors were brought within the scope of coverage by the 1968 amendments. See 7 U.S.C.A.Supp. § 6b. Their roles and responsibilities were defined in the 1974 amendments. See 7 U.S.C.A.Supp. §§ 6*l*, m, n, o.

**10.** The Commodities Exchange Commission notes an administrative interpretation of "in connection with" in Section 4 in *Secretary of*

*Agriculture v. H. W. Armstrong & Co.,* C.E.A. Docket No. 12 (decided March 11, 1940) (Br. 10). There the Assistant Secretary of Agriculture concluded that the 1936 Act had been violated by the respondents who through false and misleading statements had solicited customers and prospective customers to open accounts and to give the respondents power of attorney to trade on their behalf.