FORE WAY EXPRESS, INC., Plaintiff-Counterclaim-Defendant-Appellant,

v.

Gordon BAST, Jr., James Godeck, William J. Hill, Gary Kaye, Betty Levandoski, Nunzio J. Maniaci, William A. Peters, Anton F. Przybylski, Ken Scheuer, Leroy Sobieszczyk and Robert Van Handel, Defendants-Counter Claimants-Respondents,

v.

David J. NARLOCH, Robert P. Brown, Stephen P. Steffke, Allen D. Betz, Joel D. Breitzman, and Fore Way Services, Inc., f/k/a Regency Enterprises, Ltd., a Wisconsin corporation, Additional-Counterclaim-Defendants-Appellants,

Howard REINHART, Additional-Counterclaim-Defendant.

Court of Appeals

*No. 92–3116. Oral argument June 22, 1993.—Decided August 3, 1993.*

(Also reported in — N.W.2d —.)

693

694

695

For the plaintiff-counterclaim-defendant-appellant, and the additional-counterclaim-defendants-appellants, the cause was submitted on the briefs of *Steven M. Anderson*, and orally argued by *Arnold Kiburz* of *Ruder, Ware, Michler & Forester* of Wausau, and orally argued by *David Loeffler* of Greenfield.

For the defendants-counterclaimants-respondents, the cause was submitted on the brief of *Thomas L. Skalmoski* of *Weiss, Berzowski, Brady & Donahue* of Milwaukee and *Gregory A. Grobe* of *Liebmann, Conway, Olejniczak & Jerry, S.C.* of Green Bay and orally argued by *Thomas L. Skalmoski.*

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. Fore Way Express, Inc., and several of its officers (collectively, Fore Way) appeal a summary judgment declaring that the Fore Way Express Profit Sharing Plan (the Plan) is a security required to be registered under sec. 551.21, Stats., and awarding the respondents $138,873.46 in damages and prejudgment interest and $180,553.82 in costs and attorney fees. Fore Way contends that the trial court erred by refusing to grant summary judgment in its favor because the undisputed facts demonstrate that the Plan is neither a profit sharing agreement nor an investment contract

within the meaning of sec. 551.02(13)(a). Fore Way argues that the trial court misapplied the "economic realities" test to determine whether the substance of an instrument constitutes a profit sharing agreement or an investment contract. In the alternative, Fore Way argues that disputed issues of material fact precluded summary judgment. Fore Way also contends that the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185 (1978), preempts the respondents' state law claims and LMRA, 29 U.S.C. § 173 (1978), requires the respondents to submit their claims to arbitration before seeking judicial relief. Fore Way argues that the Plan was a valid amendment to its Collective Bargaining Agreement (CBA) with the Teamsters Union and therefore was subject to CBA's arbitration provisions and the LMRA.

We conclude that there are no disputed facts precluding summary judgment. We further conclude that the proper test for determining whether the Plan is either a certificate of participation in a profit sharing agreement or an investment contract is to examine the facts underlying the Plan to determine if it is consistent with the economic realities commonly underlying those two types of security. Because the Plan involves no underlying securities, no pooling of assets and does not constitute a certificate of participation in a profit sharing agreement independent of the employment relationship, we conclude that the facts are inconsistent with the economic reality underlying a certificate of participation in a profit sharing agreement. Because the respondents' interest in the Plan is not an independent financial interest that has the substantial characteristics of a security and because the respondents failed to demonstrate a reasonable expectation of a benefit over and above the value of their conceded

wages, we conclude that the facts are inconsistent with the economic reality underlying an investment contract. Because Fore Way has prevailed on this basis, we need not address Fore Way's preemption and necessity of arbitration claims. The judgment is reversed.

## I. FACTS

Fore Way is a closely-held trucking corporation. In January 1985, Fore Way's management unsuccessfully attempted to negotiate a compulsory unilateral wage reduction with the union representing 70% of its employees, citing a precarious financial situation due to increased operating costs and decreased profits. With the union's permission, Fore Way then submitted what it called a wage concession plan titled "15% Employee Profit-Sharing Plan" to its employees. Participation in the Plan was voluntary, with a minimum participation contingency of 85% of full-time employees. Although the union did not formally approve the Plan, it agreed to "step aside" and allow the employees to make individual decisions whether to participate in the Plan.

The Plan, "for the benefit of employees," provided for a 15% wage reduction. The term of the plan was from October 1, 1985 to December 31, 1987. During the period of the Plan, a portion of the conceded wages would be recovered through pro rata distributions of operating profits. The percent of operating profits available for distribution to employees depended upon the achievement of certain operating ratios.

When Fore Way presented the Plan to the employees through a series of meetings, it indicated that it was experiencing financial difficulty and that the Plan was an alternative to layoffs. At one of the meetings, Fore Way presented a table showing the percent of

wages that would be recovered, assuming participation by 100% of the employees, at different operating ratios. The table indicated that, assuming all of the employees participated in the 15% wage reduction program, they would recover 100% of their conceded wages if the operating ratio was approximately 86. However, the historical operating ratios presented to the employees demonstrated that the best ratio ever achieved was 88 in 1976 and that the best realistic operating ratio forecast during the Plan was 95, meaning only 31% of the total conceded wages would be recovered.

Approximately 86% of Fore Way's employees elected to participate in the Plan. During the Plan's term, Fore Way distributed "Profit Grams" showing the operating ratio and the percent of profit sharing return, detailing the favorable and unfavorable factors and commenting on the results. At the end of the term, a cumulative total of only 15.5% of the total conceded wages was restored.

During the Plan's term, Nunzio Maniaci registered a complaint regarding the Plan with the Wisconsin Commissioner of Securities. In response, a staff attorney from the commissioner's office informed Fore Way that the Plan was an unregistered, non-exempt security. However, the commissioner's office later informed Fore Way that it did not intend to take any formal action. Thus, there was no formal hearing, and the commissioner made no formal findings of fact or conclusions of law concerning the Plan.

Fore Way then commenced an action seeking a declaratory judgment that the Plan is not a security. The respondents counterclaimed, seeking rescission plus interest and attorney fees. Both sides moved the trial court for summary judgment, and the court granted the respondents' motion. The trial court

rejected Fore Way's argument that the respondents' state law claims are preempted by the National Labor Relations Act, 29 U.S.C. § 185(a) (1978) and that the respondents are required to exhaust the grievance/arbitration procedures provided in the collective bargaining agreements (CBA). The trial court ultimately concluded that the Plan is a security under sec. 551.02(13)(a), Stats., because it is both a profit sharing agreement and an investment contract.

## II. STANDARD OF REVIEW AND LEGAL BACKGROUND

When reviewing a grant of summary judgment, appellate courts independently apply the same methodology as the trial court. *Grotelueschen v. American Family Mut. Ins. Co.*, 171 Wis. 2d 437, 446, 492 N.W.2d 131, 134 (1992). That methodology has been set forth numerous times, and we need not repeat it here. *See Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473, 476 (1980).

Whether the Plan is a security within the meaning of sec. 551.02(13)(a), Stats., involves interpretation and application of statutes and regulations to undisputed facts, which is a question of law appropriate for summary judgment. *See Brandt v. LIRC*, 160 Wis. 2d 353, 361, 466 N.W.2d 673, 676 (Ct. App. 1991). "A motion for summary judgment carries with it the explicit assertion that the movant is satisfied that the facts are undisputed . . . . Therefore, when only one reasonable inference can be drawn from those undisputed facts as a matter of law, reciprocal motions for summary judgment waive the right to a jury trial." *Grotelueschen*, 171 Wis. 2d at 446–47, 492 N.W.2d at 134 (citations omitted).

701

Fore Way argues that it is entitled to summary judgment based on the undisputed facts. In the alternative, Fore Way argues that because different inferences could reasonably be drawn from the undisputed facts, summary judgment is inappropriate. Fore Way argues that disputes exist concerning "the circumstances under which the Plan arose, the method in which it was presented to the employees, the manner in which it was implemented, the nature of the employees' interests under the Plan, the expectations of the employees with respect thereto and the reasonableness of such expectations." While we agree that *Grotelueschen* precludes summary judgment where more than one inference can reasonably be drawn from the disputed facts, it is assertions of disputed fact, not inferences, that underlie Fore Way's position. At trial, Fore Way moved the trial court for summary judgment and thereby asserted that the material facts are undisputed. *See id.* Because a motion for summary judgment amounts to an explicit assertion that the material facts are undisputed, a party who moves for summary judgment is precluded from later asserting that disputed material facts entitle it to a jury trial. *Id.* at 447, 492 N.W.2d at 134. We therefore conclude that when Fore Way filed its motion for summary judgment, it waived its right to present evidence concerning what it now alleges are disputed material facts and cannot claim entitlement to a hearing that it previously asserted was unnecessary.

Section 551.21(1), Stats., provides in part, "It is unlawful for any person to offer or sell any security . . . unless it is registered under this chapter or the security or transaction is exempted under s. 551.22, 551.23 or 551.235." The statutory definition of "security"

includes stocks, notes, bonds, certificates of interest or participation in a profit sharing agreement, investment contracts and "in general, any interest or instrument commonly known as or having the incidents of a security or offered in the manner in which securities are offered." Section 551.02(13)(a), Stats.

Section 551.67, Stats., provides, "This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact the 'Uniform Securities Act' and to coordinate the interpretation and administration of this chapter with related federal regulation." Where the Federal Securities Act of 1933[1] and the Securities Exchange Act of 1934[2] and their accompanying regulations do not conflict with Wisconsin's, federal case law interpreting those acts and regulations is instructive. Also, in view of the statute's stated uniformity purpose, caselaw from other jurisdictions that enacted the Uniform Securities Act is also instructive.

In *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), the United States Supreme Court recognized that the Securities Exchange Act is a remedial act designed to protect investors by requiring full disclosure from issuers of securities, and should be construed broadly. The Court noted that the term "security," as used in both the 1933 and 1934 Acts, "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 338, (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)). The

[1] 15 U.S.C. § 77a-bbbb.
[2] 15 U.S.C. § 78a-lll.

fact that a device is novel, unique or irregular does not automatically remove it from the reach of the securities laws. *Tcherepnin*, 389 U.S. at 338. As sec. 551.02(13)(a), Stats., states, a security is "any interest or instrument . . . having the incidents of a security or offered in the manner in which securities are offered."

## III. THE PROPER TEST

Fore Way notes that the Supreme Court has repeatedly stated that when determining whether an instrument is a security, "form should be disregarded [in favor of] substance and the emphasis should be on economic reality." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 848 (1975) (citing *Tcherepnin*, 389 U.S. at 336). "Because securities transactions are economic in character Congress intended the application of [the securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 849. Thus, when confronted with an unusual instrument not easily characterized as a security, courts should look to the economic reality underlying the transaction. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 690 (1985). The inquiry is whether the economic reality underlying the transaction indicates that the instrument is actually a type that falls within the usual concept of a security. *Id.* Stated broadly, the test "is what character the instrument is given in commerce by the terms of the offer, plan of distribution, and the economic inducements held out to the prospect." *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982) (citation and quotation omitted).

The specific questions asked under the general economic reality test will differ depending on what cat-

egory of security the court is confronted with. For example, the specific questions asked under the general economic reality test in *Howey* apply only to investment contracts, and are inapplicable to determine whether an instrument fits within a different example listed in the statutory definition of "security." *Landreth*, 471 U.S. at 691. We therefore reject Fore Way's attempt to dispose of both questions, whether the Plan is a certificate of interest or participation in a profit sharing agreement and whether the Plan is an investment contract, by applying the *Howey* economic realities test.

The Supreme Court has carved out only two exceptions to the general rule emphasizing the examination of the economic reality behind the transaction. First, instruments purported to be stocks are examined under a "label and significant characteristics" test: instruments labeled "stock" that also possess the significant characteristics typically associated with stock are governed by the securities laws. *Reves v. Ernst & Young*, 494 U.S. 56, 62 (1990) (citing *Landreth*, 471 U.S. at 687, 693). Second, notes are analyzed under the "family resemblance" test. *Id.* at 65. The "family resemblance" test begins with a rebuttable presumption that every note is a security. *Id.* at 67. That presumption may be rebutted only by showing the instrument bears a strong resemblance (in terms of four identified factors) to one of the enumerated categories deemed not to be a security. *Id.* For all other categories of securities, specifically profit sharing agreements and investment contracts, the general economic realities test applies and there is no presumption that an instrument bearing a traditional title is a security. We therefore conclude that the proper test to determine whether the

Plan is a profit sharing agreement or an investment contract is the economic realities test.

## A. PROFIT SHARING AGREEMENT

The respondents correctly argue that Fore Way erroneously applies the *Howey* economic realities test for investment contracts to determine whether the Plan is a "certificate of interest or participation in a profit sharing agreement" within the meaning of sec. 551.02(13)(a), Stats. *See Landreth*, 471 U.S. at 691. The economic realities underlying an investment contract are different from those underlying a profit sharing agreement. We now turn to the question of what are the economic realities underlying this transaction to determine if it amounts to a "certificate of interest or participation in a profit sharing agreement."

Our research has uncovered scant authority concerning this question. In fact, as the seventh circuit noted in *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 102 (7th Cir. 1977), "courts have made no real distinction between investment contracts and [certificates of interest or participation in a profit sharing agreement]." Professor Loss wrote, "The classic example of a 'certificate of interest or participation in [a] profit sharing agreement' is a contract whereby the buyer furnishes funds and the seller the skill for speculating in the stock or commodities markets under an arrangement to split any profits." 1 LOSS, SECURITIES REGULATION 489 (2d ed. 1961). We conclude that the Plan does not fit within the "classic example" of a certificate of participation in a profit sharing agreement for the following reasons.

First, apparently the agreements in the cases cited by Loss as examples involved many investors giving

money to someone considered an expert in market dealings or commodities who would use that money to purchase stocks or commodities on the market. *See Hirk*, 561 F.2d at 102; 1 LOSS, SECURITIES REGULATION 489 n.87. In contrast, the respondents conceded 15% of their wages to allow Fore Way's management to use the money internally to help Fore Way reduce its operating costs and thereby increase its profit margin, not to allow an expert to purchase stocks or commodities. The term certificate of interest or participation in a profit sharing agreement seems to envision an agreement whereby various investors furnish funds to an expert who furnishes the skill for speculating in the stock or commodities markets and who is authorized to purchase stocks or commodities expected to generate profits that will be shared with the investors. The term does not encompass employer-created plans of distributing income to employees, and its connotation is different from the common public perception of a profit sharing agreement.

Additionally, the *Hirk* court held that, to be covered by the securities laws, an instrument purporting to be a certificate of interest or participation in a profit sharing agreement must provide for the "pooling" of investment funds. *Id.* That is, the funds obtained from various investors must be commingled or deposited together in one or more accounts. The court noted that the cases cited by Loss as examples of profit sharing agreements that constitute securities all involved "wide-spread public participation in profits" and a pool of investors' funds used to purchase various interests. *Id.* The absence of pooling of investments was a key factor in the *Hirk* court's determination that the profit sharing agreement was not a security, but an "agency-for-hire relationship." *Id.* at 100, 102. Like the plan in

707

*Hirk,* here the record fails to disclose that an investment pool of funds derived from the respondents' wage concessions was created to purchase interests that would generate income to be distributed to the respondents. Because the Plan does not involve a contract whereby several buyers furnish funds that are pooled together under an arrangement to split any profits derived from those funds, we conclude that the Plan does not fit within the "classic example" of a certificate of participation in a profit sharing agreement.

The respondents rely heavily on *Hood v. Smith's Transfer Corp.,* 762 F.Supp. 1274 (W.D. Ky. 1991); *Harris v. Republic Airlines, Inc.,* [1987–88 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 93,772 (May 19, 1988); and *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 940 F.2d 564 (10th Cir. 1991), in support of their contention that the Plan is a profit sharing agreement. The respondents' reliance on these cases is misplaced. All three of these cases involved employee stock ownership plans (ESOPs) that plainly fall within the stock category of securities. Here, Fore Way's employees were not offered stock in the company. Additionally, *Harris* and *Uselton* held that the ESOPs constituted investment contracts, and not profit sharing agreements. We conclude that these cases involving stocks and investment contracts are inapposite to the question whether the Fore Way Plan constitutes a certificate of participation in a profit sharing agreement.

The respondents also rely on *Tcherepnin,* 389 U.S. at 339, to support their conclusion that the Plan is a "certificate of interest or participation in any profit-sharing agreement" within the meaning of sec. 551.02(13)(a), Stats. The Court in *Tcherepnin* held that the petitioners' withdrawable capital shares were

securities based on its determination that the "petitioners' shares most closely resemble investment contracts." *Id.* at 338. The Court noted that the shares could also be viewed as certificates of interest or participation in a profit sharing agreement because "the shares must be evidenced by a certificate[ ] and Illinois law makes the payment of dividends contingent upon an apportionment of profits." *Id.* at 339 (footnote omitted). Here, no "certificates of interest or participation" were issued to the respondents.

We note that the key difference between the interests determined to be securities in *Hood, Harris* and *Uselton* and the respondents' interest in the Plan is that the interest in those cases existed independently of an employment relationship. In *Hood*, ESOP participants agreed to a 15% reduction of their wages in exchange for shares of Smith's Transfer common stock, to be held in trust for them by the ESOP. The court held that the ESOP is a security because it is labeled "stock" and possesses the significant characteristics of stock. *Hood*, 762 F.Supp. at 1290. Likewise, the *Harris* court, confronted with essentially the same facts, held that the Partnership Plan constituted "stock" because it offered the employees Republic Airlines stock. *Id.* at 14–16. In *Uselton*, the employees exchanged a 17.35% reduction in wages for an interest in the company's ESOP, which was funded with common stock. Although no proceeds from the wage reduction program were used to purchase stock, each participant had the right to receive distributions of stock if certain contingencies were met. *Id.* at 570–72.

In each of these cases, the employees received shares of stock that they owned regardless of their continuing employment relationship with their employers. Because ownership of common stock carries

with it the right to participate in profits in the form of dividends, the employees' right to participate in profits also existed independently of their employment relationship. Similarly, in *Tcherepnin*, 389 U.S. at 336–37, the petitioners were holders of withdrawable capital shares that had a statutory existence independent of any relationship the petitioners may have had with City Savings Association of Chicago.

Here, the respondents' interest in the Plan has no existence outside of their employment relationship with Fore Way. While the Plan entitles them to share in the profits if certain contingencies are met, it does not provide them with any interest that entitles them to share in the profits once the employment relationship is terminated. Indeed, the Plan specifically provides that an employee's interest in the Plan and its concomitant entitlement to share in Fore Way's profits terminates upon the employee's resignation, retirement or other termination of employment. Furthermore, because the Plan had a limited term, the respondents' entitlement to a share of profits terminated at the end of the Plan's term. In contrast, because the plans in *Hood, Harris* and *Uselton* gave participants ownership of shares of stock, the participants in those cases are entitled to share in the profits regardless of whether their employment relationship has terminated or whether the company ceased offering stock under its ESOP plan. Similarly, the holders of withdrawable capital shares in *Tcherepnin* were entitled to dividends until they divested themselves of the shares.

In this regard, the Plan is similar to the agreement in *Marine Bank*, 455 U.S. at 559–60. The agreement between the Weavers and the Piccirillos was a private business transaction under which the Weavers were

entitled to receive a share of the profits from the Piccirillos' slaughterhouse operations as well as permissive use of the slaughterhouse. The entitlement to a share of the profits existed only within the business relationship between the parties. Although the fact that the Plan involved a private transaction between Fore Way and its employees does not automatically exempt the Plan from the securities laws, *see, e.g., Hood, Harris* and *Uselton*, we believe the fact that the Plan creates no interest in profit sharing that can exist independently of the employment relationship is one factor preventing the Plan from being classified as a certificate of participation in a profit sharing agreement.

The respondents essentially argue that the Plan is a certificate of interest or participation in a profit sharing agreement because it is a "plan to share profits." This same argument was rejected in *Simon v. Fribourg*, 650 F.Supp. 319, 321–22 (D. Minn. 1986). As that court noted, the fact that the Plan is a "profit sharing" plan does not alone render it a security. Professor Loss, *supra* at 506, notes that "[t]here is no specific reference in the Securities Act to . . . profit-sharing plans of any kind. . . . . Consequently, if any types of . . . profit-sharing plans involve the issuance of 'securities' distinct from the underlying securities [e.g. ESOPs] in which the funds are invested under the plans, it must be because the interests in these plans are investment contracts or participation in profit-sharing agreements." Moreover, as the Court stated in *Marine Bank*, 455 U.S. at 560, "Although the agreement gave the [participants] a share of the [offeror's] profits, if any, that provision alone is not sufficient to make that agreement a security." Here, the Plan

involves nothing more than the entitlement to share in profits. It involves no underlying securities, no pooling of assets and does not constitute a certificate of interest or participation in a profit sharing agreement independent of the employment relationship. We therefore conclude that the Plan is not a certificate of participation in a profit sharing agreement within the meaning of sec. 551.03(13)(a), Stats.

## B. INVESTMENT CONTRACT

Wisconsin Administrative Code § SEC 1.02(6) contains two definitions of "investment contract" as used in sec. 551.02(13)(a), Stats. The first alternative is essentially a modified *Howey* test. The second alternative is denominated the "risk capital" test. We will deal with each definition in turn.

### 1. Modified *Howey* test

Wisconsin Administrative Code § SEC 1.02(6)(a) provides that an investment contract includes:

> Any investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor. In this subsection, a "common enterprise" means an enterprise in which the fortunes of the investor are tied to the efficacy of the efforts of those seeking the investment or of a 3rd party[.]

The parties agree that the important components of this test are "investment," "common enterprise" and "expectation of profit derived through the essential managerial efforts of someone other than the investor." If the Plan fails any one of these components, it is not an investment contract within the meaning of Wis. Adm. Code § SEC 1.02(6)(a).

First, we address the question whether participation in the Plan constitutes an "investment." Fore Way argues that the respondents lacked a true investment motive because they were told that if they did not agree to a wage concession, they would lose their jobs. This same argument was rejected in *Uselton* and *Hood*. The *Uselton* court stated that "the 'save the company, save our jobs' motive . . . is consistent with a traditional investment motive because each [employee] is concerned with and makes an investment in the future of the company." *Id.* at 576. We conclude that whether the respondents were motivated to participate in the Plan by a "save the company, save our jobs" mentality is immaterial to the resolution of this element of the modified *Howey* test, but can properly be considered in the analysis of the risk capital test, discussed later.

The Supreme Court noted in *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 559–60 (1979), that:

> In every decision of this Court recognizing the presence of a "security" under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a *separable financial interest with the characteristics of a security.* . . . In every case the purchaser gave up some tangible and definable consideration in return for an interest that *had substantially the characteristics of a security.* (Emphasis added.)

As examples of other cases recognizing the presence of a security, the Court cited *Tcherepnin* (money paid for bank capital stock); *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202 (1967) (portion of premium paid for variable component of mixed variable- and fixed-annuity contract); *SEC v. Variable Annuity Life Ins. Co.*, 359

U.S. 65 (1959) (premium paid for variable-annuity contract); *Howey* (money paid for purchase, maintenance, and harvesting of orange grove); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) (money paid for land and oil exploration). In each of these cases, persons voluntarily contributed specific consideration in exchange for a separable financial interest with the characteristics of a security.

The question here is not whether the respondents voluntarily contributed a specific consideration. The respondents' participation in the Plan was voluntary, and their agreement to a 15% wage reduction constitutes specific consideration. *See Hood*, 764 F.Supp. at 1291. The question is whether the respondents' interest in the Plan is a separable financial interest that has substantially the characteristics of a security. We conclude that the Plan meets neither of these qualifications.

As we previously noted, the respondents' interest in the Plan is not a separable financial interest such as the interests cited in *Daniel*. In *Joiner*, 320 U.S. at 351, the Court noted that "[n]ovel, uncommon, or irregular devices [that do not on their faces fit one of the listed descriptions of 'security'] are also reached if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as . . . 'any interest . . . commonly known as a security.' " The Court recognized that other cases found unusual interests to be securities, even though the interests did not involve the issuance of instruments commonly known as securities (such as stocks, notes or bonds). *Marine Bank*, 455 U.S. at 559–60. However, the Court further noted that those interests involved offers of interests (1) to a number of potential investors that (2) had equivalent values

to most persons and (3) that could have been publicly traded. *Id.*

The point at which the respondents' interest in the Plan fails is that it is not easily susceptible to valuation and the interest does not have equivalent values to most persons. Each employee's interest depends upon the total dollar amount of wages conceded by that employee as well as by all participants combined and further depends upon the operating ratio achieved by Fore Way. Additionally, because the interest in the Plan does not exist outside of the employment relationship and is dependent upon the continuation of that relationship, it does not have a value to "most persons" and cannot easily be traded.

The respondents again rely entirely on *Uselton* and *Harris* to support their proposition that they made an investment by agreeing to a 15% reduction in their wages in return for participation in the Plan. However, *Uselton* and *Harris* involved employees giving up a specific consideration for an interest in ESOPs, which were separable financial interests with the characteristics of a security, specifically, stocks. In *Uselton,* 940 F.2d at 575, the court stated, "The economic reality of the transaction . . . was that plaintiffs contributed their legal right to a portion of their wages to CL in return for the right to acquire CL stock via the CL ESOP and to participate in CL's profit-sharing plan." Likewise, the *Harris* court noted that:

> The Partnership Plan, stripped to its bare essentials, amounted to a swap of employee givebacks for a share of Republic's potential future profits. . . . [T]he Plan provided that [employees] would be rewarded with Republic stock and cash if the company's performance enabled it to turn a profit in the next three years. . . . This financial relationship

completely satisfies the *Howey* economic realities test. The employees invested . . . wages and benefits as well as [future] negotiating rights . . . in exchange for Republic stock.

Unlike the plans in *Uselton* and *Harris*, the respondents have pointed to no separable interest with the characteristics of a security that they acquired by participating in the Plan. The Plan here does not involve an ESOP or any other traditional "security," except for its "profit sharing" component. In the absence of any other component of the Plan that has "substantially the characteristics of a security," the respondents have failed the investment component. Therefore, we conclude that the Plan is not an investment contract under Wis. Adm. Code § SEC 1.02(6)(a).

## 2. "Risk Capital" test

Wisconsin Adm. Code § SEC 1.02(6)(b) provides that an investment contract includes:

Any investment by which an offeree furnishes initial value to an offeror, and a portion of this initial value is subjected to the risks of the enterprise, and the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a *reasonable understanding that a valuable benefit of some kind over and above the initial value will accrue to the offeree* as a result of the operation of the enterprise, and the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise. (Emphasis added.)

The essential components of this test are "investment," "initial value," "reasonable understanding that a valu-

able benefit of some kind over and above the initial value will accrue to the offeree as a result of the operation of the enterprise" and the "investor's lack of actual or practical control over managerial decisions." If the Plan fails any one of these components, it is not an investment contract within the meaning of Wis. Adm. Code § SEC 1.02(6)(b).

We need not consider whether the investment component under the risk capital test is the same as under the modified *Howey* test, nor need we address the question whether "initial value" contemplates only startup costs in a new venture to the exclusion of existing enterprises, because the result would be the same. The respondents fail to establish that they had a reasonable understanding that they would receive a valuable benefit of some kind over and above the initial value of their "investment."

Through a series of charts presented at meetings explaining the Plan, the respondents were told that, based upon 100% employee participation, they would receive 100% of their total conceded wages in the form of shared profits only if Fore Way achieved an operating ratio of approximately 86. The charts also indicate that to receive an amount over and above their initial "investment," Fore Way would have to achieve an operating ratio of at least 86. The historical operating ratio was never lower than 89.4 and was 99 in 1985. In the face of this data, any expectation of a benefit over and above the value of the wages conceded is unreasonable. Therefore, we conclude that the Plan is not an investment contract under Wis. Adm. Code § SEC 1.02(6)(b).

Because we have concluded that the Plan is not a security, we need not address the issues concerning

attorney fees and whether the respondents claims are pre-empted by the Labor-Management Relations Act.

*By the Court.*—Judgment reversed.