STATE of Wisconsin, Plaintiff-Respondent,

v.

Louis H. LaCount,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2006AP672–CR. Oral argument January 16, 2008.
—Decided June 10, 2008.*

2008 WI 59

(Also reported in 750 N.W.2d 780.)

89

For the defendant-appellant-petitioner there were briefs by *T. Christopher Kelly* and *Kelly, Habermehl & Bushaw, S.C.*, Madison, and oral argument by *T. Christopher Kelly*.

For the plaintiff-respondent the cause was argued by *James M. Freimuth*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published decision of the court of appeals[1] that affirmed the Circuit Court for Brown County, Judge William M. Atkinson, presiding.

¶ 2. Petitioner, Louis H. LaCount (LaCount), seeks review of a published decision of the Court of Appeals, which affirmed LaCount's convictions in the Circuit Court for Brown County for securities fraud and for theft by a bailee of property valued at more than $2,500. The Respondent is the State of Wisconsin (the State).

¶ 3. There are four principal issues upon review. The first issue is whether the circuit court erroneously admitted an attorney's expert opinion testimony that LaCount had engaged in a securities transaction. The second issue is whether the evidence presented at trial sufficiently supported LaCount's conviction for securities fraud. The third issue is whether the circuit court

---

[1] *State v. LaCount*, 2007 WI App 116, 301 Wis. 2d 472, 732 N.W.2d 29.

erred by not suppressing the results of the search of the office of Gates, Paul & Lear, L.L.C. (GP&L), which was a search that allegedly exceeded the scope of the search warrant. The fourth issue is whether the circuit court's finding that LaCount was a habitual criminal violated his right to a jury trial on that issue.

¶ 4. We affirm the decision of the court of appeals. Doing so, we hold as follows: first, that the circuit court did not erroneously exercise its discretion in admitting the expert opinion testimony of Attorney David Cohen that LaCount had engaged in a securities transaction; second, that the evidence presented at trial was sufficient to support LaCount's conviction for securities fraud; third, that the circuit court did not err by allowing into evidence the results of the search of GP&L's office; and, fourth, that the circuit court's finding that LaCount was a habitual criminal did not violate LaCount's right to a jury trial on that issue.

I

¶ 5. LaCount was employed by GP&L as a debt negotiator and office manager. Between June 1998 and October 1999 LaCount was involved in three separate business transactions that led to the charges in question: first, the liquidation of the corporate assets of SMC Machine, Inc. (SMC); second, a purported investment of $64,000 by John Wills (Wills) in a real estate venture; and, third, the alleged misappropriation of funds that belonged to Mirr Tree Service (MTS).

¶ 6. Before LaCount's arrest, police executed a search warrant at the office of GP&L, and they seized approximately 500,000 pages of documents. The search warrant sought financial records that related to the clients that were named in the warrant's application,

92

specifically SMC and CDM Machine Corporation. During their search, the police discovered additional evidence that related to MTS and to Wills, even though they were not named in the warrant. The evidence led to a ten-count complaint being filed by the State against LaCount, which included charges in regard to both MTS and Wills. After the preliminary hearing, one count was dismissed. LaCount was charged with the remaining nine counts in an information filed by the State. LaCount is appealing from his convictions on counts seven and nine.

¶ 7. Count seven alleged theft by bailee of property that was valued at more than $2,500. The property in question belonged to MTS, and the alleged crime occurred between March and October 1999. Under a March 1999 fee agreement, GP&L, through LaCount, took over the finances of MTS for payroll purposes and also to pay off creditors. Allegedly, GP&L issued "worthless" payroll checks and also "failed to pay employee insurance premiums . . . ." GP&L apparently collected $772,520.20 on behalf of MTS. However, LaCount was accused of comingling that money with other GP&L accounts and of not paying out $289,303.79 as promised on MTS's behalf.

¶ 8. Count nine alleged securities fraud based on the purported sale of a security between March and April 1999 by LaCount to Wills and CPR, Inc. (CPR), a firm owned by Wills. Wills apparently met LaCount through GP&L's president, Al Nimmer. According to Wills, LaCount later approached him with a potential investment opportunity that related to the Northland Turkey Farms (Northland) property. LaCount allegedly told Wills that he was putting together a group of five investors to purchase a $350,000 bank mortgage on the Northland property, with each of the five investors

contributing about $70,000. LaCount also allegedly told Wills that if, as expected, Northland could not pay off the mortgage in six months, the investors would develop the property and sell it for $750,000 to $1,000,000, with all five investors sharing in the profit. As a result, Wills purportedly gave LaCount $64,000, in addition to Wills allegedly contributing another $4,000 that represented what LaCount had promised to pay Wills back for a previous loan. The State alleged that LaCount did not disclose material facts to Wills about the deal including: first, that the property had two other mortgages on it, which totaled another $300,000; second, that the property's owner was not interested in selling it, and had never discussed with LaCount such a sale; third, that, contrary to LaCount's assertions, foreclosure was not imminent; and, fourth, that LaCount was currently on parole for previous theft convictions, with a condition that he not close business deals of more than $50. Wills alleges that he never recovered any of the $64,000[2] that he gave to LaCount for the investment.

¶ 9. LaCount made a motion to suppress the seized financial records that corresponded to the charges relating to MTS and to the investment by Wills. In so doing, he claimed that the seizures had exceeded the scope of the search warrant. After an evidentiary hearing, the circuit court denied that motion.

¶ 10. The circuit court granted LaCount's motion to sever count nine, so that a jury's consideration of the other counts would not be influenced by a jury's knowledge of LaCount's criminal convictions. LaCount's

---

[2] The criminal complaint lists an allegation that Wills did not recover $64,000, and it contains no explanation as to why this figure is not $68,000.

criminal convictions were significant in regard to count nine, because LaCount had a duty to inform potential clients of his criminal history and parole restrictions before he entered into a securities transaction with such clients.

¶ 11. LaCount also made a motion in limine to exclude the testimony of the State's expert witness, Attorney David Cohen (Cohen), who was the supervisory counsel for the Wisconsin Department of Financial Institution's Division of Securities. According to LaCount's argument, Cohen's expert testimony concerned the application of Wisconsin securities law to the presumed facts of LaCount's alleged real estate investment agreement with Wills. LaCount's motion was denied.

¶ 12. The jury found LaCount guilty of the securities fraud alleged in count nine.[3] The circuit court sentenced LaCount to 11 years on count nine, which was the maximum sentence allowable after an enhancement for habitual criminality. The circuit court rejected LaCount's postsentencing argument that the circuit court's application of a penalty enhancer violated LaCount's right to a jury trial on that issue.

¶ 13. After LaCount's sentencing on count nine, LaCount reached a plea agreement with the State on the remaining charges. LaCount entered guilty pleas on four charges (counts one, three, four, and seven), and four charges were dismissed (counts two, five, six, and eight). On count seven, the theft by bailee charge involving MTS, the circuit court imposed a 15–year

---

[3] This was the only count that was tried to a jury because LaCount then entered into a plea agreement on the remaining counts, including count seven.

sentence,[4] which was to be served concurrently with LaCount's 11–year sentence on count nine. The circuit court also sentenced LaCount to 15 years of concurrent probation (sentence withheld) for each of the remaining charges, to be served consecutively to LaCount's sentences.

¶ 14. LaCount appealed the circuit court's decision to the court of appeals. The court of appeals rejected all of LaCount's arguments and affirmed the circuit court. LaCount filed a petition for review of the court of appeals' decision, which we granted.

## II

■

¶ 15. The first issue on review is whether the circuit court erroneously admitted an attorney's expert opinion testimony that LaCount had engaged in a securities transaction. We first address the standard of review for this issue. Whether to admit proffered " 'expert' " testimony rests in the circuit court's discretion. *State v. Shomberg,* 2006 WI 9, ¶ 10, 288 Wis. 2d 1, 709 N.W.2d 370 (citations omitted). On this issue, our review of a circuit court's use of its discretion is deferential, and we apply the erroneous exercise of discretion standard. *Id.,* ¶¶ 10–11. The circuit court's exercise of discretion will not be overturned if the decision had "a reasonable basis," and if the decision was made "in accordance with accepted legal standards and in accordance with the facts of record." *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983) (citation omit-

---

[4] The record before us does not reflect that the circuit court made a determination on what portion of the sentence would be initial confinement and what portion of the sentence would be extended supervision.

ted). Furthermore, a reviewing court may search the record for reasons to sustain the circuit court's exercise of discretion. *Id.* at 343.

¶ 16. LaCount claims that the circuit court erred in admitting the testimony of the State's expert witness, Cohen, for two reasons. First, LaCount contends that the testimony was impermissible because Cohen testified on the legal definition of an investment contract, which allegedly invaded the province of the judge as the person having the exclusive responsibility for finding and interpreting the applicable domestic law. Second, LaCount alleges that Cohen's testimony was improper because it expressed a conclusion on the ultimate fact of whether LaCount's deal with Wills and CPR was an investment contract, thus, usurping the role of the jury. LaCount also contends that the court of appeals erred by putting the burden on him to prove prejudice, and not on the State to prove that the alleged error was harmless.

¶ 17. The State argues that Cohen's expert testimony on the nature of an investment contract was admitted properly by the circuit court. The State asserts that Cohen did not give a legal definition of an investment contract in his testimony, and that Cohen merely and properly was allowed to describe the typical features of an investment contract to assist the jurors in their own factual determination as to whether the deal with Wills involved a security. Furthermore, the State argues that, even if an error occurred, it was a harmless error.

¶ 18. Wisconsin Stat. § 907.02 (2005–06)[5] addresses the admissibility of expert opinion testimony in

[5] All further references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

Wisconsin courts. That section states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."[6] Furthermore, Wis. Stat. § 907.04 states, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

¶ 19. As noted previously, appellate courts use the deferential erroneous exercise of discretion standard when reviewing a circuit court's decision to admit expert testimony. We are satisfied that the circuit court did not erroneously exercise its discretion in admitting Cohen's testimony, because the circuit court's decision rested on a reasonable basis and was in accordance with both accepted legal standards and the facts in the record. Cohen's testimony was the type of expert testimony that was envisioned by Wis. Stat. § 907.02, because it encompassed specialized financial knowledge that would assist the jury in understanding the evidence presented at LaCount's trial. Such testimony also could assist the jury in determining a fact in issue in the case, here, whether LaCount's transaction with Wills involved a security.

¶ 20. Even if, as alleged, Cohen's testimony embraced an ultimate issue, Wis. Stat. § 907.04 allows such testimony. Under § 907.04, " '[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue

[6] The parties do not dispute that Cohen was properly considered to be an expert witness under this statute.

to be decided by the trier of fact.' " *State v. Elm,* 201 Wis. 2d 452, 459, 549 N.W.2d 471 (Ct. App. 1996) (footnote omitted). LaCount argues that Cohen's testimony was not permissible because Cohen affirmatively answered the prosecutor's question on whether LaCount's deal with Wills was an investment contract.

▮

¶ 21. We also disagree with LaCount's assertion because Cohen was directly responding to a series of questions from the prosecutor concerning the nature of an investment contract. One of these questions was even objected to by LaCount's counsel as being "an improper hypothetical question." The series of questions asked could fairly be characterized as covering several hypothetical situations. Expert opinion testimony on an ultimate fact is permissible, even where the evidentiary facts on which the ultimate fact in issue depends are in dispute, so long as the opinion on the ultimate fact is given using a hypothetical case or situation. *See Rabata v. Dohner,* 45 Wis. 2d 111, 123–24, 172 N.W.2d 409 (1969) (citations omitted). Accordingly, Cohen was properly allowed to testify on the basic factual characteristics of an investment contract, in order to assist the jury in determining whether the transaction with Wills involved a security.

¶ 22. We are further satisfied that Cohen did not impermissibly testify on a legal issue, contrary to LaCount's claim that Cohen improperly testified on the definition of an investment contract. Cohen did testify that the basic features of an investment contract were someone "handing over some money," while "expecting the other person or some other person besides [themselves] to do something to generate a return for [them] on that money."

¶ 23. However, even if Cohen's statement that a security covered basically everything "you can't figure out" was overly broad, the jurors were properly instructed that they were not bound by any expert's opinion, that they were the sole judges of the facts, and that the court was the sole judge of the law. Jurors are presumed to have followed jury instructions. *See State v. Grande*, 169 Wis. 2d 422, 436, 485 N.W.2d 282 (Ct. App. 1992). Cohen's testimony was generally consistent with the jury instructions that were given and, thus, with Wisconsin law. Under such circumstances, "[w]e are unable to perceive any prejudicial error." *State v. DiMaggio*, 49 Wis. 2d 565, 580, 182 N.W.2d 466 (1971). In that case, we emphasized the therapeutic effect of the circuit court's correct instructions. *Id.* at 579–80.

¶ 24. In summary, we hold that the circuit court did not erroneously exercise its discretion in admitting the expert opinion testimony of Attorney Cohen that LaCount had engaged in a securities transaction.

## III

¶ 25. The second issue before us is whether the evidence presented at trial sufficiently supported LaCount's conviction for securities fraud. We first address the standard of review on this issue. In reviewing whether the evidence was sufficient to support a conviction, we must determine whether, after viewing the evidence presented in the light most favorable to the prosecution, " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State v. DeLain*, 2005 WI 52, ¶ 11, 280 Wis. 2d 51, 695 N.W.2d 484 (citation omitted). In

doing so, we consider all of the evidence that was submitted at trial, including any evidence that was erroneously admitted. *Lockhart v. Nelson,* 488 U.S. 33, 40–42 (1988). For an appellate court to reverse a conviction, the evidence at trial must conflict with the fully established or conceded facts. *Day v. State,* 92 Wis. 2d 392, 400, 284 N.W.2d 666 (1979).

¶ 26. LaCount claims that there was insufficient evidence to support his conviction for securities fraud. Specifically, LaCount contends that there was not enough evidence to prove that he sold a security to Wills and CPR, here, an investment contract. LaCount claims that the State did not prove, beyond a reasonable doubt, that Wills and CPR relied solely on LaCount's efforts to earn a profit, which LaCount alleges was required.

¶ 27. The State argues that sufficient evidence was presented at trial to allow the jury to find LaCount guilty of securities fraud for selling Wills an investment contract. The State asserts that LaCount's argument that an investor may not put forth any efforts himself or herself, without taking the transaction out of the realm of securities law, lacks merit, because the meaning of an investment contract is not that narrow. LaCount's proposition would frustrate the remedial purposes of securities law because it would, then, be easy to evade the law by having an investor put forth a modicum of effort. The State argues that, under Wisconsin law, an instrument is not an investment contract only if the investor did not rely predominately on the promoter's or a third-party's efforts. The State points out that Wills testified that all of the information on the investment contract in question came from LaCount, and also that LaCount stated that he would manage the investment himself. The State also argues that, even if LaCount's proposed narrow interpretation of an invest-

ment contract governs, the evidence presented would have satisfied that narrow definition because Wills testified that he lacked any role in the development or sale of the Northland property for profit. As a result, on the record of this case, the State argues that reasonable jurors could find that LaCount sold Wills and CPR an investment contract, and, accordingly, there was sufficient evidence to support the guilty verdict on count nine.

¶ 28. For the reasons discussed in detail below, we conclude that the evidence presented at trial sufficiently supported LaCount's conviction for securities fraud.

¶ 29. The State was required to prove three elements beyond a reasonable doubt to convict LaCount of securities fraud. First, the prosecution had to establish that LaCount sold Wills a security, here, an investment contract. Wis. Stat. § 551.41. Second, the prosecution had to prove that LaCount made an "untrue statement of a material fact or [omitted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they [were] made, not misleading . . . ." Wis. Stat. § 551.41(2). Third, the prosecution was required to prove that LaCount acted willfully. Wis. Stat. § 551.41. Because, LaCount contends that the prosecution failed to prove only that LaCount sold Wills a security, we will limit our discussion to that element.

¶ 30. We are satisfied that the State proved beyond a reasonable doubt that LaCount sold Wills a security, here, an investment contract. We are not persuaded by LaCount's argument, which relied on the United States Supreme Court decision of *SEC v. Edwards,* 540 U.S. 389, 393 (2004), that Wills had to

depend solely on LaCount's efforts to realize a profit for the transaction to be an investment contract. In *Edwards*, the Court defined an investment contract for purposes of federal securities law. *Id.* LaCount's argument fails because Wisconsin securities law is far broader in its definition of an investment contract than is federal law. Wisconsin courts have held that managerial efforts need not come only from the efforts of a person other than the investor. *See Fore Way Express, Inc. v. Bast,* 178 Wis. 2d 693, 505 N.W.2d 408 (Ct. App. 1993). Specifically, *Fore Way Express* cited the relevant section of the Wisconsin Administrative Code in holding that an investment contract was any " 'investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor.' " *Id.* at 712, citing Wis. Admin. Code § DFI 1.02(6)(a) (Dec. 2004).

¶ 31. We agree with the *Fore Way Express* court that an investor may have a role in the managerial efforts of an investment contract, so long as the investor does not provide the essential managerial efforts for the investment contract. Our holding today also is consistent with the Wisconsin Administrative Code, which defines an investment contract as "[a]ny investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor." Wis. Admin. Code § DFI 1.02(6)(a) (Dec. 2004). The judge's instructions to the jury in this case, as reflected in the record, were fully consistent with Wisconsin law. Furthermore, we are satisfied that Cohen's testimony was consistent with Wisconsin law.

¶ 32. In addition, as noted previously, Wills testified at trial that all of the information on the invest-

ment contract in question came from LaCount and also that LaCount promised to manage the investment himself. As a result, Wills' testimony would have supported a conviction of LaCount for securities fraud under even the more stringent federal standard, let alone the Wisconsin standard. We are satisfied that, after viewing the evidence presented in the light most favorable to the prosecution, " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *DeLain,* 280 Wis. 2d 51, ¶ 11 (citation omitted).

¶ 33. In summary, we conclude that the evidence presented at trial was sufficient to support LaCount's conviction for securities fraud.

## IV

¶ 34. The third issue on review is whether the circuit court erred by not suppressing the results of the search of GP&L's office, one that allegedly exceeded the scope of the search warrant.[7] LaCount claims that the search warrant authorized only the search for and seizure of records that related to GP&L's business with

---

[7] In addition to the specifically-named client materials, the search warrant also allowed for the search and seizure of items that were located and concealed within the GP&L premises, that were:

1. Paper records relating to any type of bank account or investment account owned by Gates, Paul and Lear, L.L.C.

2. Paper records relating to any type of bank account or investment account owned by Louis LaCount or Kevin M. Jereczek.

3. Any paper records relating to the payroll, accounts payable, telephone logs or accounts receivable of Gates, Paul and Lear, L.L.C.

specifically named clients. LaCount also argues that the search warrant did not allow the police to search his personal office within GP&L's office. We first address the standard of review for this issue. Whether a search and seizure is constitutional remains a question of law

4. Any paper records indicating the names of past and present employees of Gates, Paul and Lear, L.L.C. or past and present owners or shareholders in Gates, Paul and Lear, L.L.C.

5. Computer records which may be more fully described as any of the above types of information or data stored in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. This media includes, but is not limited to fixed hard discs and removable hard disc cartridges, laser discs, tapes, floppy diskettes and other media capable of storing magnetic coding.

6. Computer hardware, which may be described as any and all electronic devices capable of creating, converting, displaying, transmitting or analyzing magnetic or electronic impulses or data. These devices include, but are not limited to[,] computers, computer peripherals such as printers, modems, plotters, circuit boards and other electronic devices.

7. Computer software, which may be described as any and all programs or instructions capable of interpretation by a computer and related devices which is stored in the form of magnetic or electronic media. These items include, but are not limited to[,] application software, operating systems, programs, compilers, interpreters and other programming utilized to communicate with computer components.

8. Computer instructions, which may be described as existing in the form of books, manuals, notes and alike which include, but are not limited to[,] written or printed material which provides exemplars in instructions regarding the operations of computers, peripherals and software.

9. U.S. Currency received following the commission of crimes of Theft, contrary to Section 943.20(1)(a)(b)&(d), Wisconsin Statutes.

. . . .

that we review de novo and without deference to the circuit court or to the court of appeals; however, we benefit from their analyses. *State v. Meyer,* 216 Wis. 2d 729, 746, 576 N.W.2d 260 (1998).

¶ 35. LaCount argues that the search and seizure in the present case violated the prohibition in the Fourth Amendment to the United States Constitution on unreasonable searches and seizures. LaCount claims that the search warrant authorized only the search for and seizure of records that related to GP&L's business with specifically named clients. LaCount also argues that the search warrant did not allow the police to search his personal office within GP&L's office. As a result, LaCount claims that the police exceeded the scope of the search warrant.

¶ 36. The State argues that LaCount failed to meet his burden of proving that he had a reasonable expectation of privacy in any of the specific records that were seized from GP&L's office under the search warrant. Furthermore, the relevant financial records were not in LaCount's exclusive control, because GP&L's bookkeeper had the records on her computer as well. The State argues that the warrant's first five paragraphs allowed for the broad search and seizure of paper and computer records regarding GP&L's and LaCount's bank and investment accounts, in addition to records of GP&L's payroll, accounts payable, accounts receivable, and telephone logs. Furthermore, paragraphs six to eight in the warrant authorized the seizure of computer hardware, software, and instructions. As a result, the State argues that the search warrant actually authorized the seizure of all of GP&L's business records, because the warrant included the authorization to seize GP&L's computers. The State further points out that all of the items received into

evidence at LaCount's trial were within the specific terms of the search warrant. The State also argues that, even if the relevant records should have been suppressed, any error in not suppressing them was harmless. Even a cursory review of GP&L's records would have disclosed to police the names of Wills, CPR, and Northland. The State also argues that the seizure could not have disclosed Wills' and CPR's investment contract with LaCount on the Northland property deal, because it was never reduced to writing. The State also contends that, because the suppression of GP&L's records would not have prevented either Phillip Mirr's or Wills' testimony, or the introduction of their own personal records, any error in not suppressing the records was harmless.

¶ 37. LaCount does not contend that the search warrant was constitutionally overbroad in its scope. LaCount also does not contend that the application for the warrant lacked probable cause for the issuance of the search warrant. Accordingly, those issues are not before this court. LaCount only challenges the execution of the search warrant, in that he asserts the police exceeded the scope of the warrant. As the proponent of the motion to suppress, LaCount had the burden of proving that his Fourth Amendment rights under the United States Constitution had been violated by the search and seizure in question. *See State v. Whitrock,* 161 Wis. 2d 960, 972, 468 N.W.2d 696 (1991) (citation omitted).

¶ 38. A search warrant's execution must be conducted reasonably, and the search and seizure must be limited to the scope that is permitted by the warrant. *State v. Andrews,* 201 Wis. 2d 383, 390, 549 N.W.2d 210 (1996). Whether a seized item is properly within the

search warrant's scope depends on the search warrant's terms and on the nature of the items that were seized. *Id.* at 390–91. The search warrant here was a premises warrant.[8] This court has held that a premises warrant generally "authorizes the search of all items on the premises so long as those items are plausible receptacles of the objects of the search." *Id.* at 389. We continued by stating, " 'A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.' " *Id.* at 389–90 (citation omitted).

¶ 39. We find LaCount's assertion that the police exceeded the scope of the search warrant by searching LaCount's personal office within GP&L's office to be without merit. Because, the search warrant was a premises warrant, the police were entitled to search the entire premises, including the items within the premises, so long as such items were "plausible receptacles of the objects of the search." *Id.* at 389. As a result, the search of LaCount's personal office within GP&L's office was warranted, because his office's furnishings were plausible receptacles that were very likely to have contained the items that the search warrant authorized to be searched for and seized. Lawful searches, as here, may extend " 'to the entire area in which the object of the search may be found and [are] not limited by the

---

[8] The search warrant authorized the search of "[a] business office, which is . . . located in one building at 2763 Manitowoc Road, Brown County, Wisconsin. The building can be described as a one-story brown brick structure with a glass entry door bearing the name of Gates, Paul and Lear, L.L.C."

possibility that separate acts of entry or opening may be required to complete the search.' " *Id.* at 389–90 (citation omitted).

¶ 40. Furthermore, LaCount's citation in his brief to *O'Connor v. Ortega,* 480 U.S. 709 (1987), in support of LaCount's assertion that he had a reasonable expectation of privacy in his personal office is misplaced, because LaCount failed to meet his burden of providing specific information on what he alleged was seized inappropriately. Furthermore, LaCount failed to meet his burden of establishing, by a preponderance of the evidence, his subjective expectation of privacy. *State v. Orta,* 2003 WI App 93, ¶ 11, 264 Wis. 2d 765, 663 N.W.2d 358. This is true because LaCount never provided any specificity on his alleged expectation of privacy. He never testified as to what he claimed was seized inappropriately. We are satisfied that the warrant authorized the police to search all of GP&L's premises, including LaCount's personal office therein.

¶ 41. We similarly hold that LaCount's assertion that the police exceeded the scope of the search warrant by seizing records of GP&L's clients other than those specifically named in the warrant is without merit. The *DeSmidt* decision is especially helpful on the issue relating to whether the police exceeded the scope of the search warrant. *State v. DeSmidt,* 155 Wis. 2d 119, 133–34, 454 N.W.2d 780 (1990). In that case, we stated that, when "there is probable cause to believe that there exists a pervasive scheme to defraud, all the records of a business may be seized." *Id.* (citation omitted).

¶ 42. The *DeSmidt* case dealt with "whether the search of Dr. DeSmidt's dental offices and [the] seizure of his dental and business records" were constitutional. *Id.* at 124. The police investigated DeSmidt after a former employee of his dental practice contacted the

Wisconsin Department of Justice with an allegation that "DeSmidt was submitting fraudulent Medicaid and insurance claim forms." *Id.* at 125. A search warrant was issued and executed that covered all patient charts, dental records, x-ray negatives, business records, and Medicaid provider handbooks. *Id.* at 126. The investigators seized "all business records and all patient files dated from 1979." *Id.* at 127. DeSmidt was then charged with 11 counts of medical assistance fraud. *Id.* When Dr. DeSmidt challenged the search and seizure, this court held "that because there was probable cause to believe Dr. DeSmidt's dental practice was 'permeated with fraud,' the search for and seizure of all of [his] dental and business records was reasonable and therefore constitutional . . . ." *Id.* at 129. We further held that, when "there is probable cause to believe that there exists a pervasive scheme to defraud, all the records of a business may be seized." *Id.* at 133–34 (citation omitted).

¶ 43. We are convinced that the present case is analogous to our *DeSmidt* decision. Here, as in *DeSmidt,* we are satisfied that the application for the search warrant set forth probable cause to believe that a pervasive scheme to defraud existed, which made the seizure of all of GP&L's business records permissible. As a result, the seizure of documents from GP&L's office was permissible, notwithstanding the large number of documents seized.

¶ 44. Furthermore, we are satisfied that, when read as a whole, the search warrant authorized the search for and the seizure of more than merely the records of the clients specified in the warrant's application. The warrant authorized the search for and seizure of any paper or computer records that related "to any type of bank account or investment account owned by"

GP&L, LaCount, or Kevin Jereczek. The search warrant also authorized the search for and seizure of any paper or computer records that related to GP&L's payroll, telephone logs, accounts payable, or accounts receivable. The warrant further authorized the search for and seizure of any paper or computer records that indicated "the names of past and present employees of [GP&L] or past and present owners or shareholders in [GP&L]." In addition, and more generally, the warrant authorized the search for and seizure of computer hardware, computer software, and computer instructions. Because of the wide breadth of the search warrant, we are satisfied that the evidence that the State used both at the preliminary hearing and also at the trial to convict LaCount came within the scope of the search warrant.[9]

---

[9] As we have noted previously, the first nine paragraphs of the search warrant allowed for more to be seized than LaCount asserts. The evidence that led to the charges on the disputed counts fits within the warrant's language. For example, on the theft by bailee charge relating to MTS, records on that transaction would fit under paragraph three (allowing for the seizure of paper records relating to the accounts payable and accounts receivable records of GP&L) and paragraph five (allowing for the seizure of computerized equivalents of such records) given that GP&L was handling MTS's payroll. Indeed, the State presented at the preliminary hearing an accounts receivable document showing client checks that MTS delivered to GP&L.

Furthermore, paragraphs one through five authorized the seizure of paper and computerized bank and investment accounts, which provided documentation of the Northland property deal. Indeed, the bank records produced by the State at trial included a computerized printout of bank deposits that included wire transfers of $24,000 and $15,000 from Wills to GP&L. Checking account statements and reconciliation statements also provided evidence for the securities fraud charge.

¶ 45.　Even if error had occurred, we are satisfied that the error would have been harmless beyond a reasonable doubt. An "error is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *State v. Harvey,* 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189 (citation omitted). We so hold because there was sufficient testimony at trial that supports the conclusion that the discovery of information related to both of the disputed charges would have occurred anyway, notwithstanding the results of the search. We also so conclude because the testimony of Wills and of Phillip Mirr at trial would not have been affected, even if some of the records seized had been suppressed.

¶ 46.　In summary, we are satisfied that the circuit court did not err by allowing into evidence items that were seized as the result of the search of GP&L's office, including the personal office of LaCount. We are satisfied that, for the reasons discussed, the police did not exceed the scope of the search warrant. LaCount failed to satisfy his burden of showing a violation of his rights under the Fourth Amendment to the United States Constitution.

V

¶ 47.　The fourth issue on review is whether the circuit court's finding that LaCount was a habitual criminal violated his right to a jury trial on that issue. We first address the standard of review for this issue. Questions of both constitutional fact and constitutional law, on the sentence enhancement issue, are reviewed

---

The State introduced evidence, both at the preliminary hearing and at trial, which fit within the terms of the search warrant.

de novo. *See Brandmiller v. Arreola,* 199 Wis. 2d 528, 536–37, 544 N.W.2d 894 (1996).

¶ 48. LaCount claims that whether he had been convicted of a felony within the five-year period defined for purposes of the habitual criminal penalty enhancer in Wis. Stat. § 939.62(2) should have gone to the jury before the circuit court sentenced LaCount as a habitual criminal. LaCount now contends that there was a factual question as to what portion of the five-year time period had been tolled by the time LaCount had served in actual confinement while serving a sentence. LaCount also argues that a factual finding by a circuit court of the dates that a defendant spent in actual confinement in prison does not fit within the narrow exception of *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000), that allows a judge to determine the existence of a prior conviction. LaCount further contends that the State's reliance on a presentence report to establish the dates that LaCount was incarcerated was misplaced because that report was produced by the executive branch, specifically, the Department of Corrections, and, therefore, was not a judicial record. LaCount additionally argues that the presentence report was not part of a court proceeding that was designed to establish facts conclusively, such as a jury trial or a plea colloquy.

¶ 49. Under Wisconsin law, a convicted defendant is subject to a repeat offender sentence enhancement, if that defendant is "convicted of a felony during the 5–year period immediately preceding the commission of the crime for which [he or she] presently is being sentenced . . . ." Wis. Stat. § 939.62(2). When computing the relevant five-year period, the time that the defendant "spent in actual confinement serving a criminal sentence shall be excluded." *Id.*

¶ 50. The State contends that LaCount was properly sentenced as a repeat offender on count nine because the circuit court could constitutionally determine that LaCount's prior felony convictions came within the five-year time period for sentence enhancement purposes. The State claims that when, as here, the presentence report contains the dates of a defendant's actual confinement in prison on prior convictions, any disputed fact about a prior conviction is not "too far removed from the conclusive significance of a prior judicial record" to satisfy the requirements of *Shepard v. United States,* 544 U.S. 13, 25 (2005). The State also cites *People v. Matthews,* 842 N.E.2d 150, 159 (Ill. App. Ct. 2005), which held that it is proper for a sentencing court to use a presentence report for facts concerning a prior conviction. Furthermore, the State argues that the applicability of LaCount's prior conviction for purposes of the penalty enhancer was obvious on the surface of the existing judicial record. The presentence report contained information showing that LaCount's earliest possible eligibility for release from prison had to be at least six months after his sentencing date of November 12, 1993, which would be May 12, 1994. As a result, the State asserts that, even if he had been released from prison on parole on May 12, 1994, and even if LaCount had never returned to prison, he would have committed count nine within five years of his release. Accordingly, LaCount's conviction on count nine necessarily came within the five-year qualifying period immediately preceding the commission of the crime of securities fraud, which is alleged to have occurred between March and April of 1999. The State also argues that, even if error occurred, it was harmless because the failure to submit such a sentencing factor to a jury is not structural error.

¶ 51. LaCount relies on *Apprendi,* 530 U.S. at 466, to argue that a jury should have determined if the five-year time period, for purposes of Wis. Stat. § 939.62(2), was tolled by the time LaCount served in actual confinement. In *Apprendi,* the Court stated, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The United States Supreme Court held that the statutory maximum for *Apprendi* purposes was the maximum sentence that a trial court judge could impose, if the defendant were punished based on the facts that were reflected in the jury's verdict alone. *Id.* at 483. In *Blakely,* the United States Supreme Court reiterated this holding and concluded that a trial court judge could not find, for purposes of a sentence enhancement, that a defendant acted with deliberate cruelty. *Blakely v. Washington,* 542 U.S. 296, 303–04 (2004). Such a finding had to be made by a jury. *Id.* The Court held that the relevant statutory maximum was "not the maximum sentence [that] a judge may impose after finding additional facts, but the maximum [sentence that the judge] may impose *without* any additional findings." *Id.* (emphasis in original).

¶ 52. Both *Apprendi* and *Blakely* were limited recently by the United States Supreme Court in its *Shepard* decision. *Shepard,* 544 U.S. at 13. There, the United States Supreme Court dealt with whether the defendant's prior convictions were "generic burglary" offenses that would allow the defendant's sentence to be raised to the 15–year minimum sentence required of felons in possession of firearms under the Armed Career Criminal Act (ACCA). *Id.* at 16–17. The prosecution urged the United States District Court for the

District of Massachusetts to review police reports "as a way of telling whether Shepard's guilty pleas went to generic burglaries[,]" when a plea colloquy transcript, a written plea agreement presented to the court, or a comparable record of findings of fact that the defendant adopted upon entering his or her plea were not available to give such information. *Id.* at 17–20. The United States District Court refused to use police reports, and it declined to impose the 15–year statutory minimum. *Id.* at 17–18. The United States Supreme Court agreed with the district court and held that trial courts could not utilize police reports when making a decision on whether a prior offense was a "generic burglary" under the ACCA. *Id.* at 19. However, the Supreme Court held that "guilty pleas may establish ACCA predicate offenses . . . ." *Id.* The Supreme Court further held:

> [T]o determine whether a [prior] plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense [to be used for sentence enhancement] is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information.

*Id.* at 26. The *Shepard* decision relaxed the holdings of both *Apprendi* and *Blakely,* so that, when *Shepard* and *Apprendi* are read together, a trial court judge, rather than a jury, is allowed to determine the applicability of a defendant's prior conviction for sentence enhancement purposes, when the necessary information concerning the prior conviction can be readily determined from an existing judicial record.

116

¶ 53. We further note that this court recently held that a presentence report, which listed the defendant's crime and his or her date of conviction, was sufficient to "constitute an official report that would serve as prima facie proof of habitual criminality" for purposes of a penalty-enhancement statute. *State v. Bonds*, 2006 WI 83, ¶ 48, 292 Wis. 2d 344, 717 N.W.2d 133. We are satisfied that the same is true in the present case, because the presentence report listed LaCount's period of actual confinement on the prior conviction in question.[10] We are satisfied that the presentence report, combined with the certified judgment of conviction, was a judicial record, not an executive branch record, even though it was prepared by the Wisconsin Department of Corrections. As a result, we are satisfied that the circuit court's finding that LaCount was a habitual criminal did not violate LaCount's right to a jury trial, because the relevant information could be readily determined from a judicial record, here the presentence report.

¶ 54. Furthermore, the State argues, and we agree, that, even if the circuit court had erred on this issue, the error would have been harmless beyond a

---

[10] At sentencing, when the circuit court judge asked whether LaCount's counsel had any corrections to the presentence report, LaCount's counsel stated, "Any corrections are made in our sentencing memorandum." In the sentencing memorandum, LaCount's counsel did not allege that there were any errors in the dates of LaCount's actual confinement, as reported in the presentence report. Indeed, after preserving his objection on the need for a jury, and not a judge, to make the determination as to when LaCount was actually confined for sentence enhancement purposes, LaCount "chose not to contest the State's manner of proving the dates" of LaCount's actual confinement.

reasonable doubt. The United States Supreme Court recently held that the "[f]ailure to submit a sentencing factor to the jury, like [the] failure to submit an element to the jury, is not structural error."[11] *Washington v. Recuenco*, 126 S. Ct. 2546, 2553 (2006). As a result, a

---

[11] Recuenco "was convicted of assault in the second degree based on the jury's finding that he assaulted his wife 'with a deadly weapon.' " *Washington v. Recuenco*, 126 S. Ct. 2546, 2549 (2006). While the deadly weapon in question was a firearm, the jury did not make a factual finding that the weapon was a firearm. *Id.* The state "trial court applied a 3–year firearm enhancement to [Recuenco's] sentence based on its own factual findings," which violated *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (holding that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."). *Recuenco*, 126 S. Ct. at 2549 (emphasis omitted). The firearm was present during the assault, but it was not actually used to commit the assault. *Id.* The jury was not asked whether the gun was used in the assault, only whether Recuenco was armed with a firearm at the time. *Id.* The jury answered that question in the affirmative, and the judge independently applied the three-year firearm sentence enhancement, as opposed to the one-year deadly weapon sentence enhancement. *Id.*

Given that the trial court could not have subjected Recuenco "to a firearm enhancement based only on the jury's finding that [Recuenco] was armed with a 'deadly weapon,' the State conceded before the Supreme Court of Washington that a Sixth Amendment violation occurred under *Blakely*." *Id.* However, the State requested that the Supreme Court of Washington find the *Blakely* error was harmless and affirm the sentence. *Id.* at 2550. However, the Supreme Court of Washington held that such errors were structural errors, and, therefore, were not subject to a harmless error analysis. *Id.* The United States Supreme Court reversed the Supreme Court of Washington. *Id.* at 2553. The United States Supreme Court held that the "[f]ailure to submit a sentencing factor to the jury, like [the]

harmless error analysis is applicable if the error that LaCount claims in the present case occurred. *Id.*

¶ 55. It is important to note that LaCount does not allege that the circuit court reached an erroneous conclusion on this issue. LaCount offered no evidence before the circuit court to refute the State's claim on repeater enhancement. LaCount did not, nor does he now, claim that the State's information was wrong. Instead, LaCount alleges only that the circuit court used an improper procedure because the circuit court did not allow a jury to determine whether the sentence enhancement information was correct and applicable.

¶ 56. Indeed, the circuit court properly used, for repeater enhancement purposes, a certified copy of LaCount's previous felony convictions of November 12, 1993. Because of Wis. Stat. § 304.06(1)(b), regardless of the exact sentence that LaCount had received on that previous felony conviction, the earliest date that La-Count would have been eligible to have been released from confinement on discretionary parole would have been six months after the conviction date of November 12, 1993, which would have been May 12, 1994. Given that LaCount's securities fraud conviction was based on his conduct in March and April of 1999, the presentence report, which was an existing judicial record, showed on its face that even if LaCount actually had been released from prison on parole on May 12, 1994, and never returned to prison, LaCount would have committed the securities fraud in question here within five years of such release. The presentence report listed LaCount's

---

failure to submit an element to the jury, is not structural error." *Id.* As a result, a harmless error analysis was applicable and available in such cases. *Id.*

dates of actual confinement on the previous felony, which eliminated any possibility of error on the circuit court's part. As a result, the circuit court did not have to submit this issue to the jury.

¶ 57. In summary, we hold that the circuit court's finding that LaCount was a habitual criminal did not violate LaCount's right to a jury trial.

### VI

¶ 58. We affirm the decision of the court of appeals. Doing so, we hold as follows: first, that the circuit court did not erroneously exercise its discretion in admitting the expert opinion testimony of Attorney David Cohen that LaCount had engaged in a securities transaction; second, that the evidence presented at trial was sufficient to support LaCount's conviction for securities fraud; third, that the circuit court did not err by allowing into evidence the results of the search of GP&L's office; and, fourth, that the circuit court's finding that LaCount was a habitual criminal did not violate LaCount's right to a jury trial on that issue. We, therefore, affirm the decision of the court of appeals, and, thus, the convictions of Louis H. LaCount.

*By the Court.*—Affirmed.

¶ 59. ANN WALSH BRADLEY, J. (*concurring*). I agree with the majority that the circuit court did not err in admitting expert testimony and that there was sufficient evidence presented to support LaCount's fraud conviction. I also agree with the majority that the circuit court did not err by allowing into evidence the results of the search of GP&L's office and that LaCount's right to a jury trial was not violated. I write separately, however, because I disagree with the majority's discussion regarding the seizure of documents outside the scope of the search warrant.

¶ 60. The majority correctly states that it is LaCount's burden to show that his Fourth Amendment rights were violated by a search. *State v. Whitrock,* 161 Wis. 2d 960, 972, 468 N.W.2d 696 (1991); *Rakas v. Illinois,* 439 U.S. 128, 131 n.1 (1978). LaCount has the burden of establishing that he had a reasonable expectation of privacy by a preponderance of evidence. *State v. Orta,* 2003 WI App 93, ¶ 11, 264 Wis. 2d 765, 663 N.W.2d 358. As the majority notes, LaCount has utterly failed to establish that any particular piece of evidence was seized from his personal office as opposed to being seized from another place in GP&L's offices. He has therefore failed to establish that he had a reasonable expectation of privacy in any record.

¶ 61. Case closed.

¶ 62. Rather than ending its inquiry with the determination that LaCount has failed to meet his burden, the majority makes several unnecessary and problematic determinations:

¶ 63. First, the majority's determination that the general premises warrant authorized the officers to take files that were not included in the search warrant is based on the claim that the furnishings of his office were "plausible receptacles of the objects of the search." *Majority op.,* ¶ 39. It relies on *State v. Andrews,* 201 Wis. 2d 383, 389, 549 N.W.2d 210 (1996). However, the issue in *Andrews* was whether the belongings of a visitor could be searched during the execution of a general premises warrant, not whether a personal office could be searched, and files not specified by the warrant could be seized, pursuant to a general premises warrant. *Id.* at 388.

¶ 64. The rule employed in *Andrews* was that where a warrant authorizes a premises search, it allows for the search of "closets, chests, drawers, and contain-

ers" within the premises. *Id.* at 390 (quoting *United States v. Ross,* 456 U.S. 798, 820–21 (1982)). That rule tells us nothing about whether documents seized are beyond the scope of the warrant.

¶ 65. Second, the majority determines that the search warrant allowed for the seizure of all of GP&L's business records because there was probable cause to believe that there was a "pervasive scheme to defraud." It relies on *State v. DeSmidt,* in which this court determined that the breadth of a search warrant explicitly authorizing the seizure of all business records was supported by probable cause. 155 Wis. 2d 119, 129, 454 N.W.2d 780 (1990). *DeSmidt,* however, is inapplicable, as it concerned whether a search warrant was itself too broad. The issue in this case is whether records seized go beyond the scope of the warrant, which is altogether distinct from *DeSmidt.*

¶ 66. Additionally, the majority's assertion that there was probable cause to believe that there was a pervasive scheme to defraud is unsupported. Typically an argument for the existence of probable cause describes particular facts underwriting a determination of probable cause. The majority adduces nothing in this regard. What is the factual basis for the probable cause determination that there was a pervasive scheme to defraud? The majority does not tell us.

¶ 67. Third, the majority concludes that even if there was a violation of LaCount's Fourth Amendment rights, the circuit court's failure to suppress evidence is harmless. It explains that "there was sufficient testimony at trial that supports the conclusion that the discovery of information related to both of the disputed charges would have occurred . . . notwithstanding the results of the search" and that Wills's and Mirr's testimony supports the conviction. Majority op., ¶ 45.

¶ 68. A determination of harmless error requires an examination of facts surrounding the discovery of information and the evidence presented to the jury. Without such an examination it is unclear whether the information regarding the disputed charges would have been discovered. In other words, what information acquired within the bounds of the Fourth Amendment would have led to the discovery of the information? Absent an examination of the facts, I cannot agree that a failure to suppress is harmless.

¶ 69. For the reasons set forth, I cannot join these unnecessary and problematic determinations regarding the seizure of documents outside the scope of the search warrant. Accordingly, I respectfully concur.

¶ 70. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice LOUIS B. BUTLER, JR. join this concurrence.

¶ 71. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). The jury convicted Louis LaCount of committing securities fraud in violation of Wis. Stat. § 551.41 by making false representations while selling John Wills an "investment contract." An "investment contract" is identified as a type of security in Wis. Stat. § 551.02(13)(a).[1] A witness for the State, Attorney David Cohen of the Wisconsin Department of Financial Institutions, was permitted, at trial, to define "investment contract" and to testify that the transaction between LaCount and Wills was "consistent with" an

---

[1] Wisconsin Stat. § 551.02(13)(a) provides in relevant part:

"Security" means any stock; treasury stock; note; bond; debenture; evidence of indebtedness; share of beneficial interest in a business trust; certificate of interest or participation in any profit sharing agreement; collateral trust certificate; pre-organization subscription; transferable share; investment contract.

123

investment contract. The circuit court also defined "investment contract" when it instructed the jury. In order to find that LaCount sold a security, an element of the crime of securities fraud, the jury was required to find that LaCount sold Wills an investment contract.

¶ 72. I join the majority opinion, but I write separately to point out the following: (1) it was an erroneous exercise of discretion to permit an expert witness, Cohen, to define "investment contract," which is a legal term of art, because explaining the law to the jury is the exclusive province of the circuit court; (2) it was also an erroneous exercise of discretion to permit Cohen to testify that LaCount committed an element of the crime—here, the sale of a security in the form of an investment contract. However, because I also conclude that the circuit court's errors were harmless, a new trial is not warranted. Accordingly, I respectfully concur.

## I. BACKGROUND

¶ 73. A key question in LaCount's trial was whether he sold Wills a "security," as that term is defined by Wisconsin law. It was the State's theory that LaCount sold Wills an "investment contract," which is a type of security. Wis. Stat. § 551.02(13)(a). At trial, LaCount testified that he did not offer an investment to Wills involving Northland Turkey Farms or take any money from him. Before us, LaCount maintains that he merely facilitated a joint venture.

¶ 74. The background of this case is set out by the majority opinion.[2] However, relaying more of the record is helpful to my assessment of Cohen's testimony relative to the law that was applied to LaCount's conduct. Cohen was asked and answered as follows:

---

[2] Majority op., ¶¶ 5–14.

Q. ... Like one of the things you mentioned already was a stock. Is that an investment contract?

A. Yes. I mean investment contract is a very, very broad category. It basically covers everything. You label something like stock and notes because you can figure out what those are, but an investment contract is basically what you can't figure out you call an investment contract. It covers everything, you know, including the stocks, the notes, and then whatever else we can't think of because we just, you know—

. . . .

Q. Did you review any documents in connection with this case involving Mr. Louis LaCount?

A. Yes, I did.

Q. Do you recall what kind of documents you reviewed?

A. I looked at statements made by the investor. I looked at testimony. I looked at some bank records, the court files, and I'm trying to think what else.

Q. Any other kind of legal documents like mortgage assignments?

A. I looked at some mortgage assignments. We looked at some things off of CCAP. We looked at, was it, bank records I think that was.

. . . .

Q. And based on the documents that you indicated that you reviewed, are you aware that Mr. Wills invested some sixty-four to sixty-nine thousand dollars with Mr. Louis LaCount to acquire some real estate in Northland Turkey Farms?

125

. . . .

A. According to the documents I have in the file, yes. That is I'm aware of that, yes.

Q. And when you reviewed those documents, what else did you learn through those documents about the facts of this case?

. . . .

A. Well, I learned about the investment, I learned about what his expectations were when he handed over the money, and I think that's—what else—and to some degree what the background was as to the truthfulness of what he was told or wasn't told at that time.

Q. Based upon your training and experience as well as your knowledge of those facts that you learned, are the things that you learned about this Wills-LaCount transaction consistent with an investment contract?

A. Yes.

¶ 75. In its instructions to the jury in regard to the securities fraud for which LaCount was tried, the circuit court instructed, in relevant part:

Before you may find the defendant guilty of this offense, the State must prove by evidence which satisfies you beyond a reasonable doubt that the following three elements were present.

First, the item sold was a security as defined by Wisconsin law. An investment contract that meets the following definition is a security.

An investment contract is any investment in a common enterprise with the expectation of profit to be

126

delivered through the essential managerial efforts of someone other than the investor. A "common enterprise" means an enterprise in which the fortunes of the investor are tied to the effectiveness of the efforts of those seeking the investment [or] of a third party. If an investor uses his own efforts to achieve a profit, rather than relying on the efforts of a promoter or third party, the investment does not constitute a security.

## II. DISCUSSION

### A. Standard of Review

¶ 76. Whether to admit evidence is a decision committed to the sound discretion of the circuit court. *State v. Franklin,* 2004 WI 38, ¶ 6, 270 Wis. 2d 271, 677 N.W.2d 276. We will not overturn a discretionary determination of a circuit court, if the court considered the relevant facts and applied the proper standard of law. *Rodak v. Rodak,* 150 Wis. 2d 624, 631, 442 N.W.2d 489 (Ct. App. 1989). Applying an incorrect legal standard is an erroneous exercise of discretion. *State v. Carlson,* 2003 WI 40, ¶ 24, 261 Wis. 2d 97, 661 N.W.2d 51.

¶ 77. We independently review whether an erroneous exercise of discretion is harmless. *See State v. Mayo,* 2007 WI 78, ¶ 47, 301 Wis. 2d 642, 734 N.W.2d 115; *State v. Harvey,* 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189.

### B. Cohen's Testimony

¶ 78. The majority opinion asserts that Wis. Stat. § 907.02 and Wis. Stat. § 907.04 permit testimony in the form of an opinion or inference that embraces the ultimate fact; and therefore, it was permissible for

Cohen to define investment contract in his testimony.[3] The majority opinion also characterizes Cohen's testimony that the transaction between LaCount and Wills was "consistent with" an investment contract as having been given in response to a "hypothetical" question.[4] I consider both portions of Cohen's testimony in turn.

¶ 79. While it is true that Wis. Stat. § 907.04 permits the admission of opinion testimony, it does not authorize testimony on the ultimate fact when that testimony embraces "a legal concept for which a definitional instruction was required." *Lievrouw v. Roth,* 157 Wis. 2d 332, 352, 459 N.W.2d 850 (Ct. App. 1990). As the court of appeals explained,

> [A] witness' opinion that there was an 'emergency' (which is permissible under Rule 907.04) differs from a [witness'] conclusion that someone was 'negligent' (which is not permissible under Rule 907.04) because, unlike 'emergency,' which the law does not define for juries . . . 'negligence' has prerequisite terms-of-art elements about which the jury must be instructed.

*Id. Lievrouw*'s interpretation of § 907.04 is consistent with the federal courts' interpretation of Federal Rule 704, the federal analogue to § 907.04. *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990); *Strong v. E.I DuPont de Nemours Co.,* 667 F.2d 682, 685–86 (8th Cir. 1981); *U.S. Information Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3,* 313 F. Supp 2d 213, 240–41 (S.D.N.Y. 2004).

¶ 80. The majority opinion does not address the limitation that *Lievrouw* places on Wis. Stat. § 907.04 opinion testimony. Here, Cohen defined "investment

---

[3] Majority op., ¶¶ 18, 20.

[4] Majority op., ¶ 21.

contract," a type of security identified in Wis. Stat. § 551.02(13)(a), when he opined:

> I mean investment contract is a very, very broad category. It basically covers everything. You label something like stock and notes because you can figure out what those are, but an investment contract is basically what you can't figure out you call an investment contract. It covers everything, you know, including the stocks, the notes, and then whatever else we can't think of.

At the conclusion of the trial, the circuit court instructed the jury on the law in the state of Wisconsin in regard to the meaning of an investment contract. The circuit court explained:

> An investment contract is any investment in a common enterprise with the expectation of profit to be delivered through the essential managerial efforts of someone other than the investor. A "common enterprise" means an enterprise in which the fortunes of the investor are tied to the effectiveness of the efforts of those seeking the investment [or] of a third party. If an investor uses his own efforts to achieve a profit, rather than relying on the efforts of a promoter or third party, the investment does not constitute a security.

¶ 81. Cohen's testimony was inconsistent, at least in part, with the instruction given by the circuit court. His testimony described wide and non-specific parameters for transactions that are investment contracts, when he opined that "an investment contract is basically what you can't figure out . . . . It covers everything." By comparison, the circuit court carefully limited the scope of an investment contract to a "common enterprise" where the profit is expected to be achieved through the "essential managerial efforts" of someone

129

other than the investor. The admission of Cohen's testimony in this regard invaded the province of the circuit court, which is the jury's exclusive source of the law that the jury will apply. Wis. Stat. § 805.13(3).

¶ 82. Cohen also testified to his view that the transaction LaCount proposed was "consistent with" a security, an investment contract. He thereby testified that LaCount's conduct satisfied an element of the crime of securities fraud. He did not testify in response to a hypothetical question, but rather, he gave his opinion in response to a question about the specific transaction between LaCount and Wills:

Q. And based on the documents that you indicated that you reviewed, are you aware that Mr. Wills invested some sixty-four to sixty-nine thousand dollars with Mr. Louis LaCount to acquire some real estate in Northland Turkey Farms?

. . . .

A. According to the documents I have in the file, yes. That is I'm aware of that, yes.

Q. And when you reviewed those documents, what else did you learn through those documents about the facts of this case?

. . . .

A. Well, I learned about the investment; I learned about what his expectations were when he handed over the money, and I think that's—what else—and to some degree what the background was as to the truthfulness of what he was told or wasn't told at that time.

Q. Based upon your training and experience as well as your knowledge of those facts that you learned, are

130

the things that you learned about this Wills-LaCount transaction consistent with an investment contract?

A. Yes.

¶ 83. The circuit court applied an incorrect legal standard in permitting Cohen to define an investment contract and in permitting him to testify that the transaction between LaCount and Wills was consistent with an investment contract. *See Lievrouw,* 157 Wis. 2d at 352. In the first instance, the court permitted Cohen to testify to what the law is, thereby invading the province of the circuit court; and in the second instance, the court permitted Cohen to reach an ultimate fact, which is an element of the crime that required court instruction for its determination. *Id.* In applying an incorrect legal standard to Cohen's testimony, the circuit court erroneously exercised its discretion. *Carlson,* 261 Wis. 2d 97, ¶ 24.

C. Harmless Error

¶ 84. Wisconsin statutory law provides that no judgment shall be reversed, set aside or a new trial granted for the erroneous admission of evidence unless a substantial right of the party claiming error has been affected. Wis. Stat. § 805.18(2).[5] In regard to the erroneous admission of evidence, we determine whether a substantial right has been affected by application of Wisconsin's common law harmless error analysis. *See State v. Shomberg,* 2006 WI 9, ¶ 18, 288 Wis. 2d 1, 709 N.W.2d 370.

---

[5] Wisconsin Stat. § 805.18(2) is made applicable to criminal cases by Wis. Stat. § 972.11(1).

131

¶ 85. Although harmless error has been subjected to many types of analyses in many jurisdictions,[6] we apply the harmless error analysis set out in *Harvey*. *Mayo*, 301 Wis. 2d 642, ¶ 47. We do so regardless of "whether the error is constitutional, statutory, or otherwise." *Carlson*, 261 Wis. 2d 97, ¶ 46. The burden of proving the error was harmless is on the party who benefited from the error, in this case the State. *State v. Stuart*, 2005 WI 47, ¶ 40, 279 Wis. 2d 659, 695 N.W.2d 259. In order to conclude that an error was harmless, the beneficiary of the error in a criminal trial must prove that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Harvey*, 254 Wis. 2d 442, ¶ 49 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

¶ 86. In applying the harmless error test, we examine the totality of the circumstances of each individual case, including but not limited to:

> the frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case.

*Mayo*, 301 Wis. 2d 642, ¶ 48 (citing *State v. Hale*, 2005 WI 7, ¶ 61, 277 Wis. 2d 593, 691 N.W.2d 637). What factors are employed in conducting each harmless analysis depends on "the nature of the error that

---

[6] *See*, e.g., *Fry v. Pliler*, ___ U.S. ___, 127 S. Ct. 2321, 2325 (2007) (concluding that an error that is not of constitutional dimension "is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.' " (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).

occurred" and the harm the error "is alleged to have caused." *Carlson,* 261 Wis. 2d 97, ¶ 88 (Sykes, J., dissenting).

¶ 87. In the case before us, both errors involve erroneously admitted evidence. First, the circuit court erroneously admitted Cohen's description of the parameters of an investment contract, and his description was not a correct statement of the law. Cohen's definition was overly inclusive. However, the court properly instructed the jury on the definition of an investment contract in Wisconsin. Jurors are presumed to follow the instructions of the circuit court. *State v. Grande,* 169 Wis. 2d 422, 436, 485 N.W.2d 282 (Ct. App. 1992). Furthermore, while Cohen's definition of an investment contract is too broad, Wills' uncontradicted testimony, set out below, fits well within the definition of an investment contract given by the circuit court.

¶ 88. The second erroneously admitted evidence is Cohen's testimony that the transaction between LaCount and Wills was "consistent with" an investment contract. At trial, LaCount testified that he did not offer any deal to or take any money from Wills. Therefore, Wills' testimony about the characteristics of the investment he made with LaCount is unexplained by the other person to the transaction, LaCount. Wills set out his understanding of what he was purchasing as follows:

Q. What else did he tell you about Northland Turkey Farms?

A. ... They had—they owned the property, and I forget how many acres, a hundred, two hundred acres or something like that, and it was a fairly nice looking piece of property .... Mr. LaCount was looking for investors to invest in—to act as a bank

and take over the mortgage before it was foreclosed on and—it would be up to the turkey farm to buy it back eventually as their business progressed. If they couldn't, then the property would be probably sold as he explained it to me at a sheriff's sale, and at that point in time the sheriff's sale would bring in "X" amount of dollars, and that would be divied up between the five investors, one of which I was going to be a fifth of the investors' group.

Q. Did he represent to you what the property was likely worth and could be sold for?

A. Yes, in the neighborhood of three-quarters of a million to a million dollars. . . .

. . . .

Q. . . . [D]id Mr. LaCount indicate to you how much money he needed from you for this investment?

A. Yes. . . . I guess that number would come out to around $70,000.

. . . .

Q. Did Mr. LaCount, did he make any representations to you about the certainty of this investment or the security of the investment?

A. Yes. . . . [H]e explained to me that because they hold all the finances for the company, they are overseeing all their financial matters, when the money comes in, they personally or he will personally go and purchase the mortgage of the property and that there's no way we can lose on this property because it's worth well over the $350,000 that we're putting into this.

Q. So Mr. LaCount would be the one who would be managing the—

134

A. Correct.

Q. —the operation?

A. Correct.

. . . .

Q. Let's talk a little more specifically about what you're claiming Mr. LaCount told you. As I understand it, you're saying you were told that five people were each going to invest about $70,000 to buy out a $300,000 mortgage, isn't that right, or $350,000 mortgage?

A. Correct.

Q. Okay. And then the investors would either be able to sell that land. If it did come to the point of a foreclosure, they'd either be able to sell it to a developer at a profit or it would get sold at a sheriff's sale for a profit?

A. Correct.

. . . .

Q. So in essence you and the other investors were going to act as a developer for the property, true?

A. As it was explained to me, I wasn't going to have anything to have to do with it other than reap the benefit. Mr. LaCount was going to be the one that was going to spearhead the whole—the whole deal.

¶ 89. Wills' testimony supports the jury's determination that LaCount sold Wills a security because LaCount sold Wills an investment contract. Wills described his participation in the common enterprise of purchasing some type of rights in property owned by Northland Turkey Farms. His testimony fits within the framework of an investment contract as the circuit

135

court described investment contract to the jury because of Wills' passive participation in the investment and his reliance on the efforts of LaCount for the expected profit. For example, Wills described LaCount as saying that he, personally, would do what needed to be done to get the deal underway and that Wills would have no role in the investment, except providing one-fifth of the money and then waiting to "reap the benefit."

¶ 90. Cohen's testimony that the transaction between LaCount and Wills was "consistent with" an investment contract is not at odds with Wills' testimony. Furthermore, the State's case against LaCount was very strong, in part because Wills' testimony about the terms of the investment LaCount proposed was uncontradicted, but also because other witnesses established a money trail into accounts to which LaCount had access. The money trail testimony gave credibility to Wills' testimony about the payments he said he made to LaCount and it contradicted LaCount's trial testimony that he did not take any money from Wills.

¶ 91. Accordingly, I conclude that it is clear beyond a reasonable doubt that a rational jury would have found LaCount guilty absent the erroneous admission of Cohen's flawed definition of an investment contract and absent the admission of Cohen's opinion that the transaction between LaCount and Wills was "consistent with" an investment contract.[7] Therefore, the errors were harmless.

---

[7] The majority opinion asserts that because the circuit court instructed the jury that it was not bound by an expert's opinion (Crim. J. Ins. 205), any error in Cohen's testimony was harmless. Majority op., ¶ 23. I cannot subscribe to this view of the effect of Instruction 205 because to do so would immunize from any claim of error in all statements made by expert witnesses.

136

## III. CONCLUSION

¶ 92. In sum, I conclude as follows: (1) it was an erroneous exercise of discretion to permit an expert witness, Cohen, to define "investment contract," which is a legal term of art, because explaining the law to the jury is the exclusive province of the circuit court; (2) it was also an erroneous exercise of discretion to permit Cohen to testify that LaCount committed an element of the crime—here, the sale of a security in the form of an investment contract. However, because I also conclude that the circuit court's errors were harmless, a new trial is not warranted.

¶ 93. Accordingly, I respectfully concur.

¶ 94. I am authorized to state that Justice LOUIS B. BUTLER, JR. joins this concurrence.