COURT OF APPEALS
DECISION
DATED AND FILED

September 6, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1965-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2014CF238**

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

SHAUN M. RUTHERFORD,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Sheboygan County: L. EDWARD STENGEL, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Shaun M. Rutherford appeals from a judgment convicting him of child enticement, capturing an image of nudity without consent, and two counts of repeated sexual assault of the same child under the age of thirteen. He also appeals from an order denying his postconviction motion for a new trial. Rutherford argues that the trial court erroneously exercised its discretion in allowing what he asserts was "unqualified expert testimony" at trial from a detective regarding a cell phone that police seized from Rutherford. Rutherford also contends the court erred in concluding his trial counsel did not provide ineffective assistance of counsel by failing to request a *Daubert*[1] hearing or object to the detective's testimony, failing to call or thoroughly question various witnesses at trial, and failing to request individual voir dire of three of the jurors mid-trial. We affirm the judgment of conviction and postconviction order of the trial court.

## BACKGROUND

¶2    In early Spring 2014, Rutherford's daughter "Nicole,"[2] then a thirteen-year-old, ran over to a friend's house and told her friend that she had discovered her father's smart phone recording her when she got out of the shower that day. Rutherford had entered the bathroom while Nicole was showering and said he was getting a Q-Tip. Nicole found Rutherford's phone in a Q-Tip box directly across from the shower. She picked up the phone when she first noticed it in the bathroom and saw that the phone had been recording video footage for approximately seven minutes. Nicole said that she had left her father's house after

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[2] We use a pseudonym to protect the victim's right to privacy.

2

she found the video because she was "fed up and didn't want to deal with this anymore."

¶3     The mother of Nicole's friend encouraged Nicole to tell her own mother about the incident. Nicole did, and her mother immediately took Nicole to the Sheboygan Police Department where Nicole gave a statement to police. Nicole detailed repeated assaults by Rutherford, including Rutherford requiring her to "squat over" him and lower her vagina to his mouth, and Rutherford forcing Nicole into penis-to-vagina sex, which she told the officers "hurt." Nicole recounted one incident when she was much younger in which Rutherford lured her into his bedroom, made Nicole take her clothes off and go inside a closet, and then put a plastic bag over her head and tied it tight with one of his neckties. Nicole said the incident abruptly ended when Rutherford heard a door open and told Nicole to put her clothes back on and exit the closet. She also gave details to police regarding an incident where Rutherford made Nicole watch pornography with him and told her to do things to Rutherford that they had watched, including making Nicole touch Rutherford's penis and put it into her mouth.

¶4     Pursuant to Nicole's report, officers seized two Samsung Galaxy cell phones, both smart phones, from Rutherford's living room. Officers would later learn that both phones belonged to Rutherford; he had a Samsung S2 smart phone for work and a Samsung S3 smart phone for personal use. The S3 was examined using Cellebrite software by Detective Joel Clark, a Sheboygan County officer with twenty years of law enforcement experience and extensive training involving digital forensic recovery. When reviewing the download of Rutherford's S3, Clark found three pictures of Nicole's torso and crotch in which Nicole was wearing black-and-white leggings and a specific pair of underwear, which was pulled down partially to reveal her pubic area, that investigators later found in

Rutherford's house. Clark was unable to find a recording of Nicole in the shower on Rutherford's S3.

¶5 Rutherford was charged with two counts of repeated sexual assault for the acts which Nicole described from 2006 through 2008 and from 2009 until 2012. Rutherford was also charged with one count of child enticement for the incident involving the plastic bag over Nicole's head in the closet when she was younger, and with capturing Nicole's nude image for the photographs of her crotch that Clark recovered from Rutherford's S3. Rutherford was not charged with any crime relating to the video of Nicole in the shower.

¶6 Before the trial, the State filed a motion in limine asking the trial court to permit Clark to testify that he found it odd that Rutherford's cell phones, and in particular the S3 smart phone, did not contain SD cards. The State theorized that because Rutherford told detectives that he had "[l]ots of pornography" on his S3 but officers did not find much other than explicit photos of Rutherford and his fiancée, Rutherford must have removed an SD card containing the shower video before his S3 was seized. The State requested that Clark be allowed to testify "based upon [Clark's] training and experience" that "when he reviews cell phones in his capacity as an officer, approximately 80 percent of the time, smart phones have SD cards in them, and that it's very unusual for an S3" not to have an SD card.

¶7 The trial court determined that Clark could testify about SD cards and smart phones, ruling as follows: "if you can qualify him with some degree of expertise or experience[, Clark] can say this is a smart phone, and that the smart phone is capable of having an SD card and [Clark] can explain what he understands the purpose of an SD card" to be.

¶8      The case proceeded to a jury trial. Nicole's forensic interview was played for the jury. Nicole also testified regarding specific incidents of abuse that stood out in her mind, including the offenses for which Rutherford was ultimately convicted. She testified about finding the video when she exited the shower and, when talking about the impact that the abuse from her father would have on her life, Nicole became upset and had to request a break from testifying. The State called several other witnesses at trial who generally corroborated various points of Nicole's testimony, including Nicole's brother, several of Nicole's friends and other family members, and some of Rutherford's former romantic partners, including Nicole's mother.

¶9      Clark also testified at trial, stating he had forensically examined "[h]undreds" of cell phones, describing his process for those examinations, and explaining for the jury that a "smart phone" is a "phone that is going to allow internet access, any type of messaging," capable of downloading "apps," such that the smart phone "really gives you all the ability of a laptop computer in your hand." Clark explained how a smart phone takes pictures and videos, specifically addressing the components and their placements on a Samsung S3, noting that a person recording a video would be able to see that video on the phone's screen. Clark testified that his own cell phone was an S3 like Rutherford's.

¶10      In addition, Clark testified about SD cards, explaining that they are "easily removable from a smart phone." Clark demonstrated with Rutherford's S3 phone how "[y]ou just have to take th[e] plastic cover off ... a spring-loaded slot" and the SD card "pops" in and out. Clark testified that when he purchased his own S3 smart phone, it did not have an SD card, and he noted that Rutherford's S3 also did not have an SD card in it when police seized it. Clark explained that a user could save pictures or videos to the phone's own internal memory system without

adding an SD card. He discussed the photos of Nicole that he discovered after the Cellebrite download of Rutherford's S3 and his experience in determining whether pictures were original to the phone or came from an app or a website, but testified he did not find the seven-minute video of Nicole in the shower after the download.

¶11 Rutherford's trial counsel conducted an extensive cross-examination of Clark. Clark agreed with trial counsel that a Cellebrite report would not indicate whether Rutherford's smart phone ever had an SD card. When asked on cross-examination whether Clark had found "any evidence" "on [the S3 smart phone] that would lead [him] to believe … that an SD card has been used," Clark responded that he "could not find evidence" of that, but he "found indicators that would lead [him] to believe items may have been stored on an external card."[3]

¶12 At one point during the trial, the State alerted the trial court, outside the presence of the jury, that some of Nicole's family members who were observing the trial recognized three members of the jury from previous jobs and social groups. Trial counsel explained to the court that he and Rutherford discussed potentially requesting voir dire of those jurors "to see if it would have any impact on their deliberations," but thought that "would call more attention to the matter than is really warranted." Counsel further clarified to the court that he was "putting [his explanation] on the record so Mr. Rutherford understands [trial counsel's] decision not to request that the [c]ourt voir dire these individuals."

---

[3] Trial counsel later testified at a postconviction hearing that counsel understood these "indicators" Clark referenced to be "an absence of an SD card being in the phone and an absence of the pornography he expected to find on the phone."

6

¶13     Rutherford testified at trial in his own defense and denied Nicole's allegations against him. He denied removing an SD card from his phone, claiming he "did not have [one] for [his] phone. It was not sold with an SD card." Rutherford admitted that he was "pretty good" at deleting content such as adult photos and videos from his phone. After deliberations, the jury convicted him on all counts.

¶14     Rutherford filed a postconviction motion seeking to vacate his judgment of conviction and requesting a new trial. Rutherford alleged that Clark testified inaccurately and impermissibly as an unqualified expert at trial, and his trial counsel was ineffective in multiple respects, including not calling potential defense witnesses at trial. The trial court held a hearing at which testimony was provided by trial counsel, Clark, and a defense witness who testified about SD cards and Rutherford's S3 smart phone.

¶15     The trial court denied Rutherford's motion in an oral ruling. The court rejected Rutherford's assertions that Clark's testimony was "false" or inaccurate and that Clark had offered "an unqualified expert opinion." Further, although a *Daubert* hearing "could have been requested," the court explained that it "further understands and knows based upon other proceedings that Detective Clark would be qualified under the standards of a *Daubert* hearing … to testify in matters of this nature" had a hearing been sought. Finally, the court found that trial counsel was not ineffective for failing to request a *Daubert* hearing in part because of counsel's familiarity with Clark's qualifications, and in part as a strategic decision designed to elicit favorable testimony from Clark regarding the absence of the video from the S3 and the lack of evidence as to whether the S3 ever had an SD card.

¶16    As to not calling certain witnesses and not pursuing various lines of questioning, the trial court found that counsel did not perform deficiently because counsel made "decisions as to his strategy" based on his experience and training. The court also found no prejudice resulting from counsel's trial performance, noting that "[n]o affidavits or other evidence were offered … to cause this [c]ourt to conclude that evidence from any of those witnesses would significantly or appreciably undermine the [c]ourt's confidence in the jury's verdict." The court observed that the "primary focus is generally upon the testimony of those parties directly involved," and specifically found Nicole's testimony "compelling and convincing." Rutherford appeals.

## DISCUSSION

*The Trial Court Did Not Erroneously Exercise Its Discretion in Allowing Detective Clark to Testify to His Opinions Regarding the Samsung S3 Smart phone and the SD Card.*

¶17    Rutherford argues that the trial court erroneously exercised its discretion in allowing Clark's testimony regarding the S3 smart phone and the purportedly missing SD card. He asserts Clark did not qualify as an expert witness because the information he provided "was not based on any scientifically valid principals and lacked reliable foundation and relevance" such that Clark could not offer expert opinion testimony about the S3's contents. Rutherford contends that because Clark's testimony went beyond lay opinion testimony, it should have been subject to a complete ***Daubert*** analysis by the trial court. We disagree. As we now discuss, we conclude that a witness need not be an expert to take information provided by a cell-phone provider and testify to its contents based on the witness's training and experience with cell-phone downloads and

8

with a particular cell phone when the testimony presented is not generally technical or scientific and assists a jury with understanding the evidence.

¶18    It is within the trial court's discretion whether to admit proffered expert testimony.  *State v. Pico*, 2018 WI 66, ¶15, 382 Wis. 2d 273, 914 N.W.2d 95.  We review the court's decision under an erroneous exercise of discretion standard and therefore we will not reverse its decision if the court "had 'a reasonable basis,'" and "the decision was made 'in accordance with accepted legal standards and … the facts of record.'"  *Id.* (*quoting State v. LaCount*, 2008 WI 59, ¶15, 310 Wis. 2d 85, 750 N.W.2d 780).

¶19    Rutherford's argument regarding Clark's testimony is predicated on whether the testimony qualified as expert testimony under WIS. STAT. § 907.02 (2021-22),[4] or lay opinion testimony under WIS. STAT. § 907.01.  These statutes provide:

> **907.02 Testimony by experts.**
>
> **(1)** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.
>
> **(2)** Notwithstanding sub. (1), the testimony of an expert witness may not be admitted if the expert witness is entitled to receive any compensation contingent on the outcome of any claim or case with respect to which the testimony is being offered.

---

[4] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

**907.01 Opinion testimony by lay witnesses.** If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are all of the following:

**(1)** Rationally based on the perception of the witness.

**(2)** Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

**(3)** Not based on scientific, technical, or other specialized knowledge within the scope of a witness under [§] 907.02(1).

¶20    As is evident from these statutes, Wisconsin recognizes a difference between expert opinion testimony, which is subject to *Daubert* standards, and lay opinion testimony, which is not. Specifically, WIS. STAT. § 907.01 permits a witness to give lay opinion testimony "[i]f the witness is not testifying as an expert" and the testimony meets the other requirements of the statute as set forth above. *Id.*

¶21    We conclude that Clark did not testify as an expert witness, and thus the trial court was not required to conduct a *Daubert* hearing to determine Clark's qualifications as an expert. Although the State sought in its motion in limine to permit Clark's testimony "that based upon his training and experience it is very unusual for" Rutherford's smart phone "to not contain MicroSD cards," the court denied that motion. The court's order rejecting that motion did not otherwise limit Clark's ability to testify about cell phones, SD cards, or cell-phone cameras; it only prohibited Clark from testifying "that it's unusual for [Rutherford's S3] not to have an SD card and that approximately 80 percent of the time, smart phones have SD cards."

¶22    Clark testified at trial as to his own personal experience with operating an S3 smart phone, speaking to how its camera works as someone who

had used the camera feature on his own S3 "[m]ultiple times." Thus, when Clark opined that "[f]ront-facing picture[s] will not take a flash," or that the photos of Nicole were not "selfies," those opinions were "[r]ationally based on the perception of the witness," as WIS. STAT. § 907.01(1) contemplates. Likewise, Clark was again speaking from personal experience as an owner and operator of the same type of smart phone when he testified that the pictures of Nicole recovered from the Cellebrite download were "no longer in their original form on that phone," suggesting that at one point they had been either deleted or moved to an external source like an SD card. The opinions Clark offered were lay opinion testimony from a detective who had substantial training in and experience recovering deleted data from cell phones; this was unlike testimony from an expert who may have studied the subject matter but did not have the day-to-day personal experience with the S3 that Clark did.

¶23 Moreover, the mere fact the testimony may have been somewhat technical does not render it expert testimony unless that testimony is "within the scope of a witness under [WIS. STAT. §] 907.02(1)." WIS. STAT. § 907.01(3). Clark's testimony was not complicated. Indeed, as Rutherford's trial counsel opined at the postconviction hearing, "[t]he extent to which [Clark's] testimony was going to be even technical in nature was minimal," such that "you could have called the janitor from the hallway" to explain the technology as it was "not something" that "required a great deal of expertise." In short, Clark's testimony was admissible as lay opinion under section 907.01 because it was not scientifically-based "expert" opinion testimony that would require analysis under the *Daubert* standards.

¶24 Although the parties cite to no published Wisconsin cases on the subject, several federal courts, when applying the federal analog to WIS. STAT.

§ 907.01, have similarly concluded that a police officer gave lay testimony when discussing the extraction of cell phone data using Cellebrite and the contents of the Cellebrite report. *See United States v. Chavez-Lopez*, 767 F. App'x. 431, 433-34 (4th Cir. 2019) (rejecting contention that officer's testimony about the extraction of the cell-phone data necessarily involved an expert opinion about the accuracy of Cellebrite); *United States v. Marsh*, 568 F. App'x. 15, 16-17 (2d Cir. 2014) (holding that an officer gave lay testimony rather than expert testimony because he "did not purport to render an opinion based on the application of specialized knowledge to a particular set of facts" when discussing cell-phone data extracted through Cellebrite); *see also United States v. McLeod*, 755 F. App'x. 670, 672-75 (9th Cir. 2019); *United States v. Seugasala*, 702 F. App'x. 572, 575 (9th Cir. 2017). We see no meaningful distinction between the testimony addressed in these cases and the testimony Clark provided at Rutherford's trial, and we conclude that the trial court did not erroneously exercise its discretion in allowing Clark to testify as to matters involving the S3 smart phone and the SD cards. Nor, as we discuss in greater detail below, was it ineffective assistance for trial counsel not to request a *Daubert* hearing.[5]

*The Trial Court Did Not Err in Denying Rutherford's Postconviction Motion Alleging Ineffective Assistance of Trial Counsel.*

¶25 Rutherford raises two general categories of purported errors in support of his argument that his trial counsel was ineffective. First, he submits ineffective assistance claims regarding Clark's testimony, alleging counsel should

---

[5] Because we are affirming on the ground that Clark's testimony was not an unqualified expert opinion, we need not reach the other arguments by the parties regarding the trial court's discretionary decision to allow Clark's trial testimony regarding the S3 smart phone and SD cards. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (noting we need not address other issues when one is dispositive of the appeal).

have objected, should have sought a ***Daubert*** hearing, and should have sought an adjournment to obtain an expert. Second, Rutherford argues counsel was ineffective for not requesting that the trial court conduct voir dire of the three jurors trial observers recognized, for not calling certain witnesses, and/or for not asking certain questions of witnesses who were called. As we now explain, even if we were to conclude that trial counsel's performance was deficient in any of these alleged matters, Rutherford's ineffective assistance claims fail because he has failed to demonstrate he was prejudiced by counsel's performance.

¶26 A postconviction claim of ineffective assistance of counsel must show that counsel's performance was deficient and the deficient performance prejudiced the defense. ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." ***Id.*** To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Id.*** at 694. If a defendant fails to satisfy one prong of the ineffective assistance of counsel test, we need not address the other. ***Id.*** at 697.

¶27 Whether a defendant has been denied the right to effective assistance of counsel presents a mixed question of law and fact. ***State v. Trawitzki***, 2001 WI 77, ¶19, 244 Wis. 2d 523, 628 N.W.2d 801. The trial court's findings of historical fact will not be disturbed unless they are clearly erroneous. ***Id.*** The ultimate determinations based upon those findings of whether counsel's performance was constitutionally deficient and prejudicial are questions of law subject to our independent review. ***Id.***

¶28    Here, we need not decide whether trial counsel performed deficiently because we conclude that Rutherford has not shown he was prejudiced by any of the alleged errors by trial counsel.  Simply put, Rutherford has not established a reasonable probability his trial would have ended differently absent any of the alleged errors.

¶29    Our conclusion is based on two observations.  First, as the parties argued to the jury in closing, witness credibility was of particular importance in this case.  No witnesses testified they observed any of the assaults Nicole described, and the State did not introduce physical evidence to corroborate them.  Nor, as the trial court noted in its ruling denying Rutherford's postconviction motion, was there any evidence proffered to demonstrate that any of the witnesses trial counsel either did not call or allegedly did not question thoroughly would have provided any testimony that could have undermined Nicole's account of the incidents or corroborated Rutherford's denial.  The question of Rutherford's guilt thus depended to a substantial degree on whether the jury believed Nicole's account of the assaults or Rutherford's denial.

¶30    Our second observation echoes one made by the trial court in its decision denying Rutherford's postconviction motion:  the evidence presented at trial was more than sufficient to sustain the jury's verdict.  Nicole provided detailed accounts of numerous sexual assaults that occurred over a multi-year period.  She described an evolving course of increasingly sexual conduct perpetrated by Rutherford that started with the incident in the closet where there was nudity but no touching and progressed over time to include kissing, oral sex, and ultimately vaginal intercourse.  The jury also heard evidence that after the physical assaults stopped, Rutherford took photos of Nicole's body parts while she was sleeping.  Nicole's recounting of these incidents included specific locations

14

(detailing the progression of the assaults each time Rutherford lived in a new residence), significant contemporaneous events (such as Rutherford making Nicole watch pornography with him), and descriptions of the specific sexual positions or acts she and Rutherford engaged in. Nicole also provided details regarding her favorite outfit and the color of the sheets that positively identified her as the individual on the bed in the nude photos.

¶31 The State also called several witnesses to corroborate aspects of Nicole's testimony. Two of Nicole's friends testified that Nicole told them Rutherford had sexually assaulted her, including one testifying that Nicole had told her about the assaults years before she reported them and the other testifying that Nicole also told her she saw Rutherford's phone recording her in the shower. Nicole's brother testified that he was not with Nicole and/or Rutherford at all times when he and Nicole were at Rutherford's various residences. One of Rutherford's ex-girlfriends testified she often was away at work on Sundays when Nicole and her brother were staying at the residence where she lived with Rutherford. That same ex-girlfriend further testified she and Rutherford kept plastic grocery bags in the closet at their first residence and Rutherford enjoyed auto-erotic asphyxiation; she also recounted an incident in which Rutherford had her tighten a men's necktie around his neck during sexual intercourse. Nicole's former step-father recalled a time when Nicole was around six years old, and she asked him if it was ever "okay to put a plastic bag over somebody's head." These and other of the State's witnesses provided substantial corroboration to many of the details Nicole had included in her testimony.

¶32 The evidence presented by Rutherford was, by comparison, meager. Rutherford testified in his own defense and denied he had committed any of the assaults to which Nicole testified. He further testified that he had never once been

alone with Nicole at the locations where she testified the assaults occurred. He also called a family friend and two family members, his then-fiancée and her daughter, to discredit certain details in Nicole's testimony and the testimony of other State's witnesses.

¶33 The trial court found Nicole's testimony "compelling and convincing," and the State presented strong evidence in support of that testimony. We conclude Rutherford has failed to show a reasonable probability the trial result would have been any different had counsel not made the alleged errors. *See Strickland*, 466 U.S. at 694.

¶34 Finally, we reject Rutherford's argument that he received ineffective assistance when trial counsel failed to request that the trial court conduct additional voir dire of the individual jurors with potential connections to trial observers in the gallery. Even if we were to assume counsel should have requested additional voir dire, Rutherford cannot show prejudice as the described connections were minimal, old, and unrelated to the case or the parties themselves and no members of the jury indicated any awareness of a potential connection to members of the jury. Additionally, when discussing the potential connections between members of the gallery and jurors, the court indicated it had "not seen from either side [of the gallery] any expressions of an improper nature towards any of the parties or the witnesses." Rutherford has not shown any facts suggesting either subjective or objective bias, and we see no basis for concluding the jury was somehow biased against Rutherford when the law presumes jurors to be impartial. *See State v. Lepsch*, 2017 WI 27, ¶¶22-24, 374 Wis. 2d 98, 892 N.W.2d 682. As such, Rutherford has not shown a "reasonable probability" of a different outcome at trial as a result of counsel's alleged failure to voir dire the jurors. *See Strickland*, 466 U.S. at 694.

16

¶35 For the reasons stated above, we conclude that Rutherford has not demonstrated that the trial court erroneously exercised its discretion in allowing Clark's opinion testimony regarding the S3 smart phone and SD cards without conducting a full *Daubert* hearing. Nor has Rutherford proven he received ineffective assistance at trial because, even assuming without deciding that trial counsel's performance was deficient, Rutherford has not proven that those errors prejudiced him. Accordingly, the trial court did not err in denying Rutherford's motion for postconviction relief.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.